15 A.3d 30

GERALDINE MURRAY AND ODIS E. MURRAY (ESTATE OF ODIS P. MURRAY), PLAINTIFFS–APPELLANTS, v. PLAINFIELD RESCUE SQUAD AND JOHN F. KENNEDY MEDICAL CENTER, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 26, 2010—Decided March 30, 2011.

Before Judges WEFING, BAXTER and KOBLITZ.

*Luretha M. Stribling,* argued the cause, for appellants.

*Gerald J. Gunning,* argued the cause, for respondent Plainfield Rescue Squad (*Stein, McGuire, Pantages & Gigl,* attorneys; *Mr. Gunning,* of counsel and on the brief).

*Michael E. McGann,* argued the cause, for respondent John F. Kennedy Medical Center (*Ronan, Tuzzio & Giannone,* attorneys; *Mr. McGann,* of counsel; *Til J. Dallavalle,* on the brief).

The opinion of the court was delivered by

WEFING, P.J.A.D.

Plaintiffs appeal from trial court orders granting summary judgment to defendants and denying their motion to amend their complaint. After reviewing the record in light of the contentions advanced on appeal, we affirm but not entirely for reasons stated by the trial court.

Plaintiffs' suit is based upon a tragic incident that occurred in the early morning hours of August 4, 2004. Plaintiffs resided in Plainfield with three of their four sons. Shortly after 5:00 a.m., plaintiff Odis E. Murray, who was awake and up, heard gun shots. Using a flashlight, he looked out to the backyard and saw nothing untoward. He then went to the front and saw a man lying in the street. He went out and found his second son, twenty-five-year-old Odis P. Murray, bleeding profusely from his chest. There was a strong odor of gunpowder in the air. He said his son tried to tell him who had shot him. Plaintiff Geraldine Murray was in bed but awake when the shots were fired; she ran out. Seeing her son, she returned to the house to call 9-1-1. She ran back outside, and her husband told her to go inside and get dressed; she did so, anticipating going to the hospital. The Plainfield police responded promptly, as did the Plainfield Rescue Squad. A mobile intensive care unit from John F. Kennedy Medical Center (JFK) was summoned. Throughout this record, that mobile inten-

sive care unit is identified as Mercy 9, a term we shall use throughout this opinion. The parties dispute whether Mercy 9 did in fact respond to the scene. Plaintiffs assert that Mercy 9 never arrived while defendants assert that it did.

After getting dressed and checking on their youngest son, who had been asleep, Geraldine Murray went outside again. She is a registered nurse and works in the intensive care unit of another hospital. She asked why her son had not been intubated and said she got no response but that members of the rescue squad simply looked at her; she described the look as resembling a deer caught in the headlights. A minute or two later, the Plainfield Rescue Squad took her son to the closest hospital, Muhlenberg Regional Medical Center, where he was pronounced dead at 6:10 a.m. Both parents said that the only people who responded to the scene were the Plainfield police and rescue squad; they insisted that Mercy 9 was never there.

Later that morning, the Murrays' third son, Akeem, surrendered to the police and admitted that he had shot his brother. The weapon belonged to his father, who had retained it from the years he worked as a Jersey City policeman, and he kept it on a shelf in his closet. The record before us provides no explanation for this incident. Akeem is currently serving a twenty-year prison sentence for aggravated manslaughter as a result of this shooting.

On July 31, 2006, plaintiffs filed a four-count complaint, naming the Plainfield Rescue Squad and JFK as defendants. In the first count, they contended that the rescue squad was negligent in the care it provided to their son. In the second count, they alleged that the rescue squad delayed in transporting him to the hospital. In the third count, they contended that Mercy 9 never responded to the repeated calls and in the fourth, that Mercy 9 was negligent in treating their son.

Discovery in this case did not go smoothly, and we decline, at this juncture, to identify any one party as more responsible for this. Suffice it to say we are satisfied that none may escape responsibility for that. Further, we would consider it remiss not

to acknowledge the patience displayed by the several trial judges who handled the repeated discovery motions, being clearly aware of and sensitive to the tragic circumstances which generated this litigation. We note merely that the discovery end date was extended a number of times as the litigation progressed.

I

The chronology of the events, as they unfolded, is important to plaintiffs' claim, and we thus set it forth here in some detail. The Plainfield Police Department received several telephone calls of gun shots, and at 5:10 a.m. Officer Craig Kennovin was dispatched, arriving at 5:14 a.m. The Plainfield Rescue Squad was dispatched at 5:15 a.m. Three members responded to the call in the squad's ambulance, Jennifer Medford, Dawn Forte, and Christopher Colatruglio. They arrived at approximately 5:17 a.m. There was deposition testimony that they did not immediately approach the victim but had to wait until the police advised them the area was clear, and it was safe to do so.

The members of the rescue squad were Emergency Medical Technicians (EMTs). An EMT is defined by statute as one trained in basic life support services. *N.J.S.A.* 26:2K–39. Basic life support services are defined in *N.J.S.A.* 26:2K–21(b) as including "patient stabilization, airway clearance, cardiopulmonary resuscitation, hemorrhage control [and] initial wound care ... and other techniques and procedures authorized" by the Commissioner of Health.

A call was also placed to have a mobile intensive care unit, staffed by paramedics, report to the scene. A mobile intensive care unit is "a specialized emergency medical service vehicle staffed by mobile intensive care paramedics ... and operated for the provision of advanced life support service under the direction of an authorized hospital." *N.J.S.A.* 26:2K–7.

Paramedics have a higher level of training than EMTs and are certified in advanced life support services. EMTs may only assist a patient to administer specific medications for which the patient

has a previous prescription. *N.J.A.C.* 8:40A–10.1(b)(13). Paramedics, on the other hand, have standing orders authorizing the administration of certain medications depending upon the situation at hand. *N.J.A.C.* 8:41–7.1 to –7.22. They require authorization from a medical doctor to give medications beyond those within their general scope of authority.

The closest mobile intensive care unit, referred to as Mercy 6, was on another call and thus not available. Mercy 9, based at JFK and approximately six miles from the scene, was the next closest mobile intensive care unit and was dispatched in its stead. At one point there was a request, evidently by the rescue squad, to mobilize Northstar, a medivac helicopter. That request was cancelled by Mercy 9 when it was reported that Murray was in cardiac arrest; according to the record, Northstar will not transport a patient in cardiac arrest. In such an instance, the appropriate protocol is to transport the patient to the nearest hospital.

Deposition testimony established that the first task of EMTs or paramedics responding to such an emergency scene is to check the patient's airway, breathing and circulation, i.e., is the airway clear to permit the patient to receive oxygen; is the patient breathing on his own; and is blood circulating in the patient's body and delivering oxygen to the various organs and systems. This is referred to as checking the patient's ABCs. Members of the rescue squad said in their depositions that when they arrived, Murray was unconscious, unresponsive and had no pulse. Because they could not detect a pulse, they did not attempt to take a blood pressure reading but proceeded directly to cardiopulmonary resuscitation (CPR) and used a bag valve mask to supply him with oxygen. They also connected him to a defibrillator. Forte and Colatruglio placed a cervical collar on Murray and put him onto a spine board; they then placed him in their ambulance.

The report prepared subsequently by Officer Kennovin said Mercy 9 arrived at 5:28 a.m. Mercy 9's run sheet recorded its arrival time at 5:29 a.m. There were two paramedics on Mercy 9, Patrick O'Flaherty and Marisa Focht. The record is not entirely

consistent as to whether Murray was already in the rescue squad's ambulance by the time Mercy 9 arrived or whether the paramedics assisted in placing him in the ambulance, but that is not material to our analysis. His EKG revealed no activity. The paramedics tried to intubate him but encountered difficulty doing so because of his large size. The autopsy report listed Murray as weighing between 260 and 270 pounds. They also tried to start an IV line but again encountered difficulty. They were unable to locate any vein to hold the line. According to Mercy 9's run sheet, the efforts at installing an IV line started at 5:34. When the efforts to intubate Murray proved unsuccessful, they used a laryngeal mask airway instead. They also continued CPR.

According to the record, paramedics are to advise the supervising physician on duty at the hospital from which they were dispatched, in this instance, defendant JFK, of the patient's condition and his responses, or lack thereof. They do not contact the hospital to which the patient is being transported. That is the responsibility of their supervising physician. Their first line of communication with the supervising physician is cell phone. If that is unsuccessful, they turn to radio. Both Focht and O'Flaherty said both cell phones and radio failed after they arrived on the scene, and thus communications were handled by the rescue squad.

Rescue squad records place the time at which the ambulance left the scene for Muhlenberg, which at two miles away was the closest hospital, at 5:47 a.m. Medford drove the ambulance while Forte, Colatruglio and the paramedics attended to Murray, continuing with CPR and the laryngeal mask airway. The squad's run sheet shows an arrival time at Muhlenberg of 5:49 a.m. Mercy 9's run sheet shows a departure time of 5:50 a.m. and an arrival time of 5:56 a.m. The hospital's records show an arrival time of 5:55 a.m. and that Murray was asystolic, that is, lacking any cardiac activity. A record from the emergency room, however, indicates a blood pressure of 66/47 with electrical activity in the heart.

The respiratory therapist at the hospital testified that Murray was not breathing. She proceeded to intubate him but initially had difficulty because of the amount of blood in his mouth and throat. That was evacuated and she was able to insert the endotracheal tube. The hospital records indicate Murray was asystolic at 6:06 a.m. He was pronounced dead at 6:10 a.m.

An autopsy was performed. This showed that the bullet had perforated Murray's aorta, lacerated his left lung and left pulmonary vein and severed his spinal cord. Death was attributed to exsanguination.

Plaintiffs submitted two expert reports during the course of the litigation. One was from Dr. Ira Mehlman, a specialist in emergency medicine. Dr. Mehlman gave an opinion that Mercy 9 "did not arrive timely at the scene" and that the rescue squad delayed in transferring Murray to the hospital. Plaintiffs' second expert report was from Dr. William Manion, a pathologist, and was addressed to the issue of proximate causation. In his report, Dr. Manion wrote the following:

> [a]ny chance Mr. Murray had of surviving this wound was lost when Plainfield [Rescue Squad] inexplicably delayed and wasted over 30 minutes at the scene doing their "little bit of CPR" and engaging in "radio failure" with JFK. . . . Because of their delay in transporting Mr. Murray and because of their ineffective "little bit of CPR" Mr. Murray lost any chance of surviving his injury. The failures to properly assess Mr. Murray, provide usual and customary CPR and promptly transport him to the trauma center are significant deviations from usual standards of rescue squad practice and were significant contributing factors to Mr. Murray's death. Even with the tremendous delay in transporting Mr. Murray, ER records indicate that he had a blood pressure of 66/47 and his EKG demonstrates electrical activity. . . . Had he been transported promptly it is my opinion to a reasonable degree of medical certainty that he would have had a high degree of probability of surviving the bullet injury.[1]

At his deposition, Manion stated that he did not know who is responsible for responding to the scene of a shooting or what

---

[1] Dr. Manion's reference to a "little bit of CPR" was taken from a Mercy 9 record which purported to memorialize a conversation between rescue squad personnel and Mercy 9's paramedics when Mercy 9 arrived on the scene. No document prepared by the rescue squad personnel used that term; nor did the rescue squad personnel in their depositions.

paramedics were authorized, and not authorized to do when responding to a medical emergency. He quantified the "high degree of probability" of survival at twenty to thirty percent. He added that the "sooner you get to the hospital, the greater your chance of recovering."

Defendant JFK retained Dr. Richard Neibart, a cardiovascular and thoracic surgeon, as its expert. According to Dr. Neibart, Murray had no chance of surviving this shooting, no matter what was done for him in the field.

## II

We turn first to the claims asserted against the rescue squad and the trial court's grant of summary judgment dismissing those claims. The trial court concluded the squad was entitled to summary judgment under *N.J.S.A.* 26:2K–29 but not entitled to immunity under *N.J.S.A.* 2A:62A–1. Having reviewed this record and the applicable law, we are satisfied the trial court was correct as to the applicability of *N.J.S.A.* 26:2K–29. It is thus immaterial that the squad is not entitled to immunity under *N.J.S.A.* 2A:62A–1.

## A

*N.J.S.A.* 26:2K–29 provides:

No EMT-intermediate, licensed physician, hospital or its board of trustees, officers and members of the medical staff, nurses or other employees of the hospital, or officers and members of a first aid, ambulance or rescue squad shall be liable for any civil damages as the result of an act or the omission of an act committed while in training for or in the rendering of intermediate life support services in good faith and in accordance with this act.

Plaintiffs contend that defendant rescue squad is not entitled to summary judgment under this statute because its members were only certified in basic life support, not intermediate life support.[2] We agree with the trial court that plaintiffs' reading of

---

[2] We note, as did the trial court, that plaintiffs did not raise this issue until they moved for reconsideration of the trial court's grant of summary judgment.

the statute is too narrow. It is not restricted to EMT-intermediates, as plaintiffs assert, but encompasses a far broader group, including "members of a first aid, ambulance or rescue squad." The rescue squad fits squarely within the protected group.

Plaintiffs present a further argument on appeal that they did not present to the trial court in connection with the interpretation of this statute. They assert that the rescue squad is not entitled to immunity under the statute because it refers to the "rendering of intermediate life support services," and the squad members could only provide basic life support services. Plaintiffs did not squarely present this question of statutory construction to the trial court, but we have elected, in light of the significant interests presented, to consider it. Having done so, we do not consider it persuasive.

*N.J.S.A.* 26:2K–21(i) includes cardiac defibrillation in its listing of intermediate life support services. The squad members did connect Murray to a defibrillator and thus were engaged in intermediate life support services. Accordingly, they are entitled to invoke the statute.

■ We note for the sake of completeness that the use of a defibrillator by the squad members was not unauthorized, even if they were only EMTs–Basic. *N.J.S.A.* 26:2K–21(b) includes a list of basic life support services and concludes with the phrase "and other techniques and procedures authorized" by the Commissioner of Health. *N.J.A.C.* 8:40A–10.1 lists the scope of practice of EMTs–Basic. Subsection (b)(6) of this regulation includes within their scope of practice "assessment and management of cardiac ... emergencies as prescribed within the National Standard Curriculum" for EMT–Basics. That curriculum now includes cardiac defibrillation as falling within the job description of an EMT–Basic. Emergency Medical Technician–Basic; National Standard

---

Despite this procedural misstep, the trial court proceeded to consider the merits of the argument.

Curriculum, *www.nhtsa.gov/people/injury/ems/pub/emtbnsc.pdf* (last visited Mar. 3, 2011).

The Legislature has conditioned its grant of immunity under *N.J.S.A.* 26:2K–29 upon the members of a rescue squad acting in good faith. In seeking the meaning and sense of the qualifying term "good faith," we consider it reasonable to look to the interpretation of that term as it is used in describing the qualified immunity of public employees under *N.J.S.A.* 59:3–3, which provides: "A public employee is not liable if he acts in good faith in the execution or enforcement of any law." *Frields v. St. Joseph's Hosp.*, 305 *N.J.Super.* 244, 248, 702 *A.*2d 353 (App.Div.1997).

■ The Supreme Court in interpreting this statute has held that it is not sufficient for a claimant to establish ordinary negligence on the part of the public employee. So long as the public employee acted either in an objectively reasonable manner, or with subjective good faith, he is entitled to this statutory immunity. It is not necessary that a public employee satisfy both tests; either will suffice. *Canico v. Hurtado*, 144 *N.J.* 361, 367, 676 *A.*2d 1083 (1996); *Kelty v. State, Dep't of Law and Pub. Safety, Div. of State Police*, 321 *N.J.Super.* 84, 88, 728 *A.*2d 273 (App.Div.1999). Thus, "[t]o pierce section 3–3's qualified immunity, a plaintiff must prove more than ordinary negligence." *Ibid.*

■ Plaintiffs contend that the rescue squad's failure to transport Murray to a hospital for some thirty minutes constituted an undisputed issue of fact and demonstrates that the squad did not act in good faith. However, even assuming that the squad was negligent in waiting thirty minutes to transport Murray, plaintiffs have failed to show that it did not act in an objectively reasonable manner or with a lack of subjective good faith.

It is undisputed that the rescue squad was engaged in providing life-saving treatment to Murray during the thirty minutes. Even if Geraldine Murray's statement were correct, that members of the rescue squad were standing around and had a "d[eer] in the headlights" look on their faces when she spoke to them, the record

also establishes their utilization of a defibrillator; their application of oxygen and administration of CPR; calling for the assistance of a medivac helicopter, and placing Murray on a spine board with a cervical collar. Medford stated that the reason the squad did not transfer Murray immediately was because of his size, the administration of CPR, and the need for them to make an overall assessment. She made that observation, moreover, in describing their reaction to her question why her son had not been intubated. Intubation is not within the scope of practice of an EMT–Basic.

As to whether the rescue squad violated protocol by waiting thirty minutes to transport Murray to the hospital, plaintiffs point to the standard curriculum for EMTs issued by the National Highway Traffic Safety Administration. We have examined that curriculum and do not find in it the support plaintiffs claim. While the curriculum refers to the immediate transport of a patient in shock from loss of blood, it also sets forth the care that should be provided at the scene. In addition, the record is not clear that the victim demonstrated the symptoms of shock listed in the curriculum.

Based on this evidence, plaintiffs have failed to establish that even if it can be said that the rescue squad was negligent in taking thirty minutes to transport Murray to the hospital, there was a material issue of fact as to whether its actions were objectively reasonable or whether its members acted with subjective good faith. The most that might be said is that the rescue squad was negligent in deciding to assess and treat Murray on the spot, rather than promptly transporting him to the hospital. Therefore, the rescue squad was entitled to summary judgment as a matter of law.

B

Although *N.J.S.A.* 26:2K–29 is, in our judgment, dispositive with respect to plaintiffs' claims against the rescue squad, we briefly address *N.J.S.A.* 2A:62A–1, upon which the squad had also sought summary judgment. We agree with plaintiffs that the squad is

not entitled to summary judgment under this statute, which provides:

> Any individual, including ... any person who is a volunteer member of a duly incorporated first aid and emergency or volunteer ambulance or rescue squad association, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof, or while transporting the victim or victims thereof to a hospital or other facility where treatment or care is to be rendered, shall not be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care.

This statute, referred to as the "Good Samaritan Act," was enacted to encourage the rendering of medical care to those who need it, but who otherwise might not receive it, by persons who come upon such victims "by chance, without the accoutrements provided in a medical facility, including expertise, assistance, sanitation or equipment." *Velazquez v. Jiminez,* 172 *N.J.* 240, 250, 798 *A.*2d 51 (2002). The members of the rescue squad, however, did not arrive at the scene "by chance." They were dispatched there and had a pre-existing duty to render assistance to Murray in light of their status as squad members. Since the Rescue Squad had a pre-existing duty to respond to the scene of the shooting as the rescue squad for Plainfield, it was not entitled to immunity under the Good Samaritan Act. *Podias v. Mairs,* 394 *N.J.Super.* 338, 347, 926 *A.*2d 859 (App.Div.), *certif. denied,* 192 *N.J.* 482, 932 *A.*2d 32 (2007); *Praet v. Borough of Sayreville,* 218 *N.J.Super.* 218, 224, 527 *A.*2d 486 (App.Div.1987).

### III

We turn now to plaintiffs' claims against defendant JFK, which rest upon the actions, or inactions of Mercy 9. There were two aspects to plaintiffs' claims against Mercy 9. Count 3 was premised on plaintiffs' contention that Mercy 9 was never on the scene while Count 4 was premised on plaintiffs' assertion that the paramedics were negligent in the care provided to Murray. The trial court granted summary judgment on Count 4 on the basis of *N.J.S.A.* 26:2K–14, which provides qualified immunity for a mobile intensive care paramedic for "an act or the omission of an act ... in the rendering of advanced life support services in good

faith...." Plaintiffs do not challenge that order on appeal. The entire focus of plaintiffs' appeal with respect to JFK rests upon their assertion contained in Count 3 of their complaint that Mercy 9 was negligent because it did not respond to the scene.

The trial court ultimately granted summary judgment to JFK on this count, finding that the evidence was so "overwhelming" that Mercy 9 was present that "no rational factfinder" could conclude to the contrary. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995). It noted that O'Flaherty and Focht certified they were there, Officer Kennovin wrote in his report they were there, and members of the Rescue Squad said they were there.

Plaintiffs, on the other hand, point to their sworn testimony that Mercy 9 never arrived and that one member of the squad, when pressed at her deposition, appeared to retreat somewhat from her certainty. They note the difference in reported times contained in the various records as well as the fact that a portion of Mercy 9's records refer to the victim having been shot in the head, rather than the chest. They argue that if Mercy 9 did arrive, such an error would not have been made. Plaintiffs contend that the trial court was incorrect in granting summary judgment because it impermissibly engaged in weighing the credibility of the disputed evidence and failed to accord to them the benefit of all favorable inferences.

 We are satisfied that JFK was, indeed, entitled to summary judgment but reach that conclusion for a different reason. We agree with JFK that plaintiffs failed to establish a prima facie case against it. As we noted earlier, plaintiffs submitted the reports of two experts, Drs. Mehlman and Manion. Dr. Mehlman purported to offer an opinion with respect to negligence, Dr. Manion with respect to proximate causation. Dr. Manion offers no opinion with respect to the actions or inactions of JFK and the record is thus devoid of any evidence that the conduct of JFK was a proximate cause of Murray's death.

Further, Dr. Mehlman's opinion as to negligence was similarly deficient. His report merely states his opinion "that an ACLS EMS unit [presumably Advanced Care Life Support Emergency Medical Services] did not arrive timely on the scene." Dr. Mehlman provided no facts to support this bare conclusion. Indeed that one phrase is the only portion of Dr. Mehlman's report that could be interpreted to refer to Mercy 9 or JFK. As such, it is no more than a net opinion and thus legally insufficient to support plaintiffs' claims. *Polzo v. Cty. of Essex*, 196 *N.J.* 569, 583, 960 *A.*2d 375 (2008) (noting that the net opinion rule "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data"). We noted that

[u]nder the "net opinion" rule, an opinion lacking in such foundation and consisting of "bare conclusions, unsupported by factual evidence" is inadmissible. The rule requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion.

[*Carbis Sales, Inc. v. Eisenberg*, 397 *N.J.Super.* 64, 79, 935 *A.*2d 1236 (App.Div. 2007) (citations omitted).]

Dr. Mehlman's report was entirely lacking with respect to any "why and wherefore" in connection with JFK or Mercy 9. Finally, the deficiencies in Dr. Mehlman's report were in no sense cured by the report or testimony of Dr. Manion, who had no knowledge of standards governing the practice of paramedics.

## IV

The final issue on appeal is whether the trial court erred when it denied plaintiffs' motion to amend their complaint. Plaintiffs sought to amend their complaint to add Marissa Focht and Patrick O'Flaherty as defendants; to add claims against JFK for negligent hiring and supervision, based upon an assertion that it permitted paramedics to work an excessive number of hours; and to assert Focht and O'Flaherty were grossly negligent in not responding to the scene, committed fraud in preparing false reports and wrongfully cancelled the call for the Northstar medivac helicopter. Plaintiffs did not present this motion until December 2008, more than two years after their complaint was filed and more than four years after Murray's death.

We note first that plaintiffs' original complaint contained no John Doe defendants. Plaintiffs, in addition, were aware from the outset of the identity of Focht and O'Flaherty. They were thus not entitled to the benefit of the "relation back" doctrine. Focht and O'Flaherty would be clearly prejudiced by an amendment joining them as individual defendants more than two years after the statute of limitations had expired.

The decision whether to grant a motion to amend a complaint is a matter within the trial court's discretion. *Fox v. Mercedes–Benz Credit Corp.*, 281 *N.J.Super.* 476, 483, 658 *A.2d* 732 (App.Div.1995). In exercising its discretion, the court should consider whether the non-moving party will be prejudiced and whether granting permission to amend would be futile. *Notte v. Merchants Mut. Ins. Co.*, 185 *N.J.* 490, 501, 888 *A.2d* 464 (2006). "It is well settled that an exercise of that discretion will be sustained where the trial court refuses to permit new claims and new parties to be added late in the litigation and at a point at which the rights of other parties to a modicum of expedition will be prejudicially affected." *Du–Wel Prods., Inc. v. U.S. Fire Ins. Co.*, 236 *N.J.Super.* 349, 364, 565 *A.2d* 1113 (App.Div.1989), *certif. denied*, 121 *N.J.* 617, 583 *A.2d* 316 (1990).

Plaintiffs were afforded a full and fair opportunity to develop their claims in a timely manner. Having carefully reviewed this entire record, we can find no basis to conclude that the trial court abused its discretion when it denied this motion.

Finally, during the pendency of this appeal, defendant JFK filed a motion to strike plaintiffs' reply brief. Disposition of this motion was deferred to permit consideration of the substantive merits. In light of our preceding analysis, we dismiss the motion as moot.

Affirmed.