46 A.3d 1262

GERALDINE MURRAY AND ODIS E. MURRAY (ESTATE OF ODIS
P. MURRAY), PLAINTIFFS–APPELLANTS, v. PLAINFIELD
RESCUE SQUAD AND JOHN F. KENNEDY MEDICAL CEN-
TER, DEFENDANTS–RESPONDENTS.

Argued May 15, 2012—Decided July 17, 2012.

*Luretha M. Stribling* argued the cause for appellants.

*Gerald J. Gunning* argued the cause for respondent Plainfield Rescue Squad (*Stein McGuire Pantages Gigl,* attorneys).

*Til J. Dallavalle* submitted a brief on behalf of respondent John F. Kennedy Medical Center (*Ronan, Tuzzio & Giannone,* attorneys; *Michael E. McGann,* of counsel).

Justice ALBIN delivered the opinion of the Court.

In this wrongful-death/survival action, the Plainfield Rescue Squad is alleged to have unreasonably—and therefore negligently—delayed the transport of a gunshot victim to a nearby hospital, thereby causing his death. The individual members of the Rescue Squad are not the subject of the civil suit. The only issue before this Court is whether *N.J.S.A.* 26:2K–29 provides immunity to the Rescue Squad as an entity, regardless of any negligent delay in

transporting the victim. The trial court found that the Rescue Squad was statutorily immune from suit and therefore entered summary judgment in favor of the Rescue Squad. The Appellate Division affirmed.

We now reverse the dismissal of the wrongful-death/survival claims against the Rescue Squad. Although *N.J.S.A.* 26:2K–29 states that the "officers and members" of a rescue squad shall not be liable for civil damages in rendering "intermediate life support services in good faith" to a patient, the statute provides no similar immunity to a rescue squad as an entity. A plain-language reading of *N.J.S.A.* 26:2K–29 leads to the conclusion that on the summary-judgment record before us, the Plainfield Rescue Squad is subject to a civil suit for negligence. Plaintiffs have alleged sufficient facts to bring this case before a jury. We therefore reinstate the complaint against the Squad and remand to the trial court for further proceedings.

## I.

### A.

We begin with our standard of review. In construing the meaning of a statute, our review is *de novo*. *Manalapan Realty, L.P. v. Twp. Comm.*, 140 *N.J.* 366, 378, 658 *A.2d* 1230 (1995). We need not defer to the trial court or Appellate Division's interpretative conclusions—particularly if they are mistaken. *Zabilowicz v. Kelsey*, 200 *N.J.* 507, 512–13, 984 *A.2d* 872 (2009). In determining whether summary judgment was properly granted, we apply the same standard governing the trial court— we view the evidence in the light most favorable to the non-moving party. *See Henry v. N.J. Dep't of Human Servs.*, 204 *N.J.* 320, 330, 9 *A.3d* 882 (2010); *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.2d* 146 (1995); *see also R.* 4:46–2(c). The facts in this case are hotly disputed. However, it is not our charge to resolve material facts disputed by the parties; that is a matter for a jury. Because the trial court entered summary

judgment against plaintiffs, who are the non-moving parties, we must give plaintiffs the benefit of all favorable evidence and inferences presented in the record before us. *See Smith v. Fireworks by Girone, Inc.*, 180 *N.J.* 199, 214, 850 *A.*2d 456 (2004).

Cast in this light, we now turn to the record.

### B.

Shortly after 5:00 a.m. on August 4, 2004, twenty-five-year-old Odis P. Murray was shot in the chest by his younger brother outside their home at 418 Parkside Road in Plainfield. Their parents, Geraldine and Odis E. Murray, who were already awake, were alerted by "loud noises" and went outside to investigate. They found their son, Odis, lying in the street behind his car with a gunshot wound in his chest. He was conscious and able to speak and identified his brother as the shooter. Mrs. Murray—a critical-care nurse by profession—immediately returned to her home and called 9-1-1. The time was approximately 5:12 a.m. Three minutes later, a Plainfield police officer appeared on the scene. At 5:16 a.m., a Plainfield Rescue Squad (Rescue Squad or Squad) ambulance—staffed by two Emergency Medical Technicians-basics (EMT-basics) and one volunteer in-training—arrived. A mobile intensive care unit, known as Mercy 9, was dispatched from defendant John F. Kennedy Medical Center in Edison at 5:13 a.m.[1] Mr. and Mrs. Murray averred in certifications and deposition testimony that Mercy 9 never came to the scene.[2]

---

[1] A "[m]obile intensive care unit" is defined as a "specialized emergency medical service vehicle staffed by mobile intensive care paramedics or registered professional nurses trained in advanced life support nursing and operated for the provision of advanced life support services under the direction of an authorized hospital." *N.J.S.A.* 26:2K–7. The Mercy 9 unit was not a patient transport vehicle.

[2] Two Mercy 9 paramedics testified at depositions that they arrived at the Murray residence at 5:29 a.m. A Mercy 9 "patient report" indicated that the paramedics provided medical assistance, and helped to load the victim into the

Given their status as EMT-basics, the two Rescue Squad members had authority, among other things, to assess vital signs; administer oxygen; manage cardiac, respiratory, and diabetic shock emergencies; perform pulmonary and cardiopulmonary resuscitation (CPR); and provide emergency treatment for bleeding and "chest-abdominal-pelvic injuries." [3] *N.J.A.C.* 8:40A–10.1.

According to the Squad members, the patient did not have a pulse and was "unconscious and not responding to verbal stimuli or painful stimuli." They began giving him CPR and oxygen through "a bag valve mask," and then "hooked him to a defibrillator," which registered " 'no shock advised.' " They then continued performing CPR and ventilation. During this process, Mrs. Murray asked the Squad members why they were not transporting her son to the hospital or intubating him—that is, placing a tube down his larynx to secure an airway. When Mrs. Murray asked those questions, in her opinion, the Squad members "looked at [her] like a deer in headlights." Muhlenberg Regional Medical Center—the nearest hospital—was only minutes away.

Approximately fifteen minutes after their arrival, the Squad members called for a Medevac helicopter to transport the patient to a hospital. That request was canceled because protocol did not allow for such a transport when a patient is in cardiac arrest.

---

Rescue Squad ambulance before their departure at 5:50 a.m. Because these facts are disputed, they are not germane for summary-judgment purposes.

[3] An EMT is "a person trained in basic life support services as defined in [*N.J.S.A.* 26:2K–21] and who is certified by the Department of Health to perform these services." *N.J.S.A.* 26:2K–39. Although the Emergency Medical Services Act, *N.J.S.A.* 26:2K–7 to –53, "does not contain any specific provision for the training and certification of EMT–B[asic]s," the Department of Health and Senior Services has explained that "EMT–B[asic] is simply a more recent title given to those who were formerly classified as EMT–Ds under the statute." *D'Ambrosio v. Dep't of Health & Senior Servs.*, 403 *N.J.Super.* 321, 335–36, 958 A.2d 110 (App.Div.2008); *see N.J.S.A.* 26:2K–39 (defining EMT–D as "an emergency medical technician who is certified by the commissioner to perform cardiac defibrillation"); *N.J.A.C.* 8:40A–10.1(b) (defining "scope of practice for an EMT–Basic").

Eventually, Odis—who weighed between 260 and 270 pounds—was secured on a board and placed in the ambulance. Not until 5:47 a.m.—more than thirty minutes after first appearing at the scene—did the Rescue Squad members take the patient to Muhlenberg hospital. On their arrival there, hospital personnel intubated the patient and attempted to insert an intravenous line. Odis, still alive, had an active blood pressure. The bullet had perforated his aorta and severed his spinal cord. By 6:10 a.m., he was pronounced dead. The autopsy report declared the cause of death as "[p]enetrating gunshot wound to the chest."

The Murrays retained as an expert Assistant Burlington County Medical Examiner Dr. William L. Manion, who expressed the following opinions in his report. The Rescue Squad members "wasted over 30 minutes at the scene" while performing ineffective CPR, thus depriving the patient of "any chance of surviving his injury." He needed an immediate transport "to Muhlenberg Regional Medical Center Emergency Room where a surgical trauma team could have opened his chest, stopped blood loss and taken him to the [operating room] for surgical repair." Although "mortality from injuries to the thoracic aorta is high," despite the "tremendous delay in transporting" Odis to the hospital, he still "demonstrated a blood pressure of 66/47 and EKG activity in the emergency room." "Had [the patient] been transported promptly ... he would have had a high degree of probability of surviving the bullet injury." [4] "He essentially died without the benefit of ... surgical and emergency services provided by a professional trauma center only two minutes away." Dr. Manion concluded that the members of the Squad engaged in "significant deviations from usual standards of rescue squad practice [that] were significant contributing factors to [Odis's] death." [5]

---

[4] In his deposition testimony, Dr. Manion explained that a "high degree of probability of surviving" meant that the patient had between a twenty and thirty percent chance of survival.

[5] Plaintiffs also retained Dr. Ira Mehlman, "a board certified Emergency Medical physician," as an expert. In his report, he concluded "that [Mercy 9]

## II.

### A.

Plaintiffs Geraldine and Odis E. Murray—individually and on behalf of the estate of Odis P. Murray—filed a wrongful-death/survival action against defendants Plainfield Rescue Squad and John F. Kennedy Medical Center, claiming that defendants' negligence proximately caused the death of their son. The complaint alleged that the Rescue Squad's members failed both to provide critical emergency-medical treatments to Odis and to transport him promptly to Muhlenberg Regional Medical Center for life-saving medical intervention. The complaint also alleged that the Mercy 9 paramedics operating out of JFK Medical Center never arrived at the scene or, alternatively, if they did, failed to take necessary life-saving measures, such as starting an intravenous line, intubating the patient, monitoring the patient's cardiac condition, and giving emergency medications. Plaintiffs sought compensatory and punitive damages against defendants.

### B.

The trial court granted JFK Medical Center's motion for summary judgment, finding that the hospital was protected by the immunity provision of *N.J.S.A.* 26:2K-14, which shields mobile intensive care paramedics from liability for acts or omissions "in rendering of advanced life support services in good faith." The court determined that there was an insufficient showing that the paramedics of Mercy 9 did not act in good faith in treating the victim or that their failure to arrive timely was the proximate cause of the patient's death.[6]

---

did not arrive timely at the scene, and that there were delays in the ... transfer of [the] patient to the Muhlenberg Trauma Center."

[6] The trial court also denied plaintiffs' motion for leave to amend their complaint to include new claims against JFK Medical Center and to join two Mercy 9 paramedics as defendants. The Appellate Division affirmed the denial

In response to a series of motions, including a motion for reconsideration, the trial court granted summary judgment in favor of the Plainfield Rescue Squad. The court found the Rescue Squad immune under two statutes, the "Good Samaritan Act," *N.J.S.A.* 2A:62A–1,[7] and *N.J.S.A.* 26:2K–29 (providing immunity for acts or omissions "committed ... in rendering of intermediate life support services in good faith"). Without distinguishing between the two statutes, the court concluded that plaintiffs failed to make an adequate showing that the Squad members did not act in good faith. On the reconsideration motion, the court also rejected plaintiffs' argument that, because the members of the Rescue Squad were EMT-basics, *N.J.S.A.* 26:2K–29 did not apply to them. The court noted that although *N.J.S.A.* 26:2K–29 provides immunity for EMT-intermediates, and does not mention EMT-basics, the statute also provides immunity protection to " 'officers and members of a first aid, ambulance or rescue squad.' "[8] *See N.J.S.A.* 26:2K–29. The court found that the EMT-basics here are covered as members of a rescue squad.

___

of this motion. *Murray v. Plainfield Rescue Squad,* 418 *N.J.Super.* 574, 590–91, 15 *A.*3d 30 (App.Div.2011).

[7] The Good Samaritan Act provides:

Any individual, including a person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, or any person who is a volunteer member of a duly incorporated first aid and emergency or volunteer ambulance or rescue squad association, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof, or while transporting the victim or victims thereof to a hospital or other facility where treatment or care is to be rendered, shall not be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care.

[*N.J.S.A.* 2A:62A–1.]

[8] An "EMT-intermediate" is "a person trained in intermediate life support services and certified by the commissioner to render intermediate life support services as part of an authorized pre-hospital intermediate life support pilot program." *N.J.S.A.* 26:2K–21(f).

## C.

The Appellate Division affirmed the trial court's dismissal of plaintiffs' claims against both JFK Medical Center and the Plainfield Rescue Squad. *Murray v. Plainfield Rescue Squad,* 418 *N.J.Super.* 574, 578, 15 *A.*3d 30 (App.Div.2011). The appellate panel found that "plaintiffs failed to establish a prima facie case" against JFK Medical Center, primarily because neither of plaintiffs' experts offered an opinion that Mercy 9's alleged failure to arrive timely at the scene was the proximate cause of Odis's death. *Id.* at 588–90, 15 *A.*3d 30.

On the one hand, the panel maintained that the Good Samaritan Act, *N.J.S.A.* 2A:62A–1, did not shield the Plainfield Rescue Squad from civil liability. *Id.* at 587–88, 15 *A.*3d 30. It reached that conclusion because the Squad members "did not arrive at the scene 'by chance,'" but rather because it was "dispatched there and had a pre-existing duty to render assistance to [Odis]." *Ibid.*

On the other hand, the panel determined that *N.J.S.A.* 26:2K–29 conferred immunity from liability on the Rescue Squad. *Id.* at 584, 15 *A.*3d 30. Like the trial court, it rejected plaintiffs' argument that the statute, which does not refer to EMT-basics, only applies to EMT-intermediates. *Id.* at 585, 15 *A.*3d 30. The panel explained that so narrow a reading of the statute did not account for the broader immunity language covering "'members of a first aid, ambulance or rescue squad'"—a category into which the Plainfield Rescue Squad members squarely fit. *Ibid.* (quoting *N.J.S.A.* 26:2K–29). Moreover, the panel gave no credence to plaintiffs' contention that EMT-basics manning the Rescue Squad could not invoke the immunity provision of *N.J.S.A.* 26:2K–29, which only protects acts or omissions committed "in the rendering of intermediate life support services in good faith." [9] *Ibid.* The

---

[9] "Intermediate life support services" is defined as "an intermediate level of pre-hospital, inter-hospital, and emergency service care which includes basic life support functions, cardiac monitoring, cardiac defibrillation, the use of the esophageal obturator airway, and the use of military anti-shock trousers and

panel noted that by connecting Odis to a cardiac defibrillator, the Squad members were providing "intermediate life support services." *Ibid.*

It also observed that EMT-basics may engage in "basic life support services," such as managing cardiac emergencies, and that the National Standard Curriculum for EMT-basics includes cardiac defibrillation within the scope of practice. *Id.* at 585–86, 15 *A.*3d 30. Additionally, the panel concluded that the Squad members met the "good faith" requirement of *N.J.S.A.* 26:2K–29 because they were "engaged in providing life-saving treatment to [Odis] during the thirty minutes" on the scene. *Id.* at 586, 15 *A.*3d 30. In short, "plaintiffs ... failed to show that [the Squad members] did not act in an objectively reasonable manner," even if they were arguably negligent in deciding not to transport Odis promptly to the hospital. *Id.* at 586–87, 15 *A.*3d 30. Thus, "the rescue squad was entitled to summary judgment as a matter of law." *Id.* at 587, 15 *A.*3d 30.

We granted plaintiffs' petition for certification "limited to the issue whether the trial court erred in granting defendant[ ] Plainfield Rescue Squad's motion for summary judgment based on statutory immunity under *N.J.S.A.* 26:2K–29." *Murray v. Plainfield Rescue Squad,* 207 *N.J.* 190, 23 *A.*3d 415 (2011).[10]

### III.

### A.

The arguments presented by both plaintiffs and defendant address a number of issues: whether *N.J.S.A.* 26:2K–29 confers immunity on EMT-intermediates and not on EMT-basics, whether the EMT-basics in the Rescue Squad were rendering "intermediate life support services" under *N.J.S.A.* 26:2K–29, and whether

---

other techniques and procedures authorized by the commissioner." *N.J.S.A.* 26:2K–21(i).

[10] We do not pass judgment on the merits of plaintiffs' case.

the individual members of the Squad acted in "good faith," thus shielding them from liability. In making the arguments for and against statutory immunity in their briefs, the parties did not distinguish between individual and entity immunity. In other words, the parties assumed that immunity for the individual members of the Rescue Squad was the equivalent of immunity for the Rescue Squad as an entity. However, the language of *N.J.S.A.* 26:2K–29 does not support that assumption.

Our primary task here is statutory interpretation. Before analyzing *N.J.S.A.* 26:2K–29, we briefly review relevant canons of statutory construction.

### B.

The objective of all statutory interpretation is to discern and effectuate the intent of the Legislature. *Allen v. V & A Bros., Inc.,* 208 *N.J.* 114, 127, 26 *A.*3d 430 (2011). To achieve that objective, we begin by looking at the statute's plain language, ascribing to the words used "their ordinary meaning and significance." *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). We do not view the statutory words in isolation but "in context with related provisions so as to give sense to the legislation as a whole." *Ibid.* If the Legislature's intent is clear on the face of the statute, then we must apply the law as written. *Lozano v. Frank DeLuca Constr.,* 178 *N.J.* 513, 522, 842 *A.*2d 156 (2004). It is not our function to rewrite a plainly written statute or to presume that the Legislature meant something other than what it conveyed in its clearly expressed language. *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039. We turn to extrinsic interpretative aids in search of legislative intent when the statute is ambiguous, leading to more than one plausible interpretation; it leads to an absurd result inconsistent with any legitimate public policy objective; or it is at direct odds with an overall statutory scheme. *Id.* at 492–93, 874 *A.*2d 1039.

With these principles in mind, we begin by examining the language of the statute at issue.

## IV.

### A.

██ *N.J.S.A.* 26:2K–29 provides that

[n]o EMT-intermediate, licensed physician, hospital or its board of trustees, officers and members of the medical staff, nurses or other employees of the hospital, or *officers and members of a first aid, ambulance or rescue squad* shall be liable for any civil damages as the result of an act or the omission of an act committed while in training for or in the rendering of intermediate life support services in good faith and in accordance with this act.

[ (Emphasis added).]

This immunity statute distinguishes between entity liability and individual liability. The statute shields a "hospital"—an entity— and individuals, such as the employees of the hospital. The statute confers immunity on other categories of individuals, including EMT-intermediates, licensed physicians, and "officers and members of a first aid, ambulance or rescue squad." *N.J.S.A.* 26:2K–29. Importantly, the statute, by its plain language, does not provide immunity to a rescue squad as an entity. Had the Legislature intended to confer immunity on the entity at issue here, the statute would read, "No rescue squad or its members or officers shall be liable for civil damages...." *See, e.g., N.J.S.A.* 26:2K–29 ("No ... hospital or its board of trustees, officers and members of the medical staff, nurses or other employees of the hospital ... shall be liable....").

The Legislature knows how to write an immunity statute covering both an entity and its individual members. Several examples will suffice to illustrate this point. *See N.J.S.A.* 30:4–27.7(b) (immunizing "emergency services or medical transport person or their respective employers, acting in good faith ... who takes reasonable steps to take custody of, detain or transport an individual for the purpose of mental health assessment or treatment"); *N.J.S.A.* 52:17C–10(d) (granting immunity to "telephone company ... or any employee, director, officer, or agent of any such entity" for acts or omissions related to provision of 9–1–1 services); *N.J.S.A.* 2A:53A–7(a) (providing immunity to "nonprofit" charita-

ble corporation and to "its trustees, directors, officers, employees, agents, servants or volunteers").

Significantly, in the case of *volunteer* first aid, rescue, or emergency squads, the Legislature specifically conferred immunity on both the entity and the individual volunteers. *N.J.S.A.* 2A:53A–13.1 expressly provides immunity to an incorporated or unincorporated "*volunteer* first aid, rescue or emergency squad ... which provides services for the control and extinguishment of fires or emergency public first aid and rescue services, or both." (Emphasis added). In a companion statute, immunity is provided to the "authorized active *volunteer* first aid or rescue squad worker" who does not cause damage by a willful or wanton act. *N.J.S.A.* 2A:53A–13 (emphasis added).[11]

The Rescue Squad argues that if a Squad member is not liable under the immunity provision of *N.J.S.A.* 26:2K–29, then the Squad cannot be liable. That position finds no support in the language of the statute. If the Legislature intended to vicariously immunize the Rescue Squad when the Squad members are shielded from civil liability, it would have drafted a statute similar to one found in the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3. *See N.J.S.A.* 59:2–2(b) ("A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable."); *see also Tice v. Cramer*, 133 *N.J.* 347, 355, 627 *A.*2d 1090 (1993) ("[W]hen the public employee is not liable, neither is the entity."); Harry A. Margolis and Robert Novack, *Claims Against Public Entities*, comment 5 on *N.J.S.A.* 59:2–2 (Gann 2012) ("[T]he entity will be shielded by any immunity or defense which would shield the employee from liability.").

---

[11] At oral argument before this Court, counsel for the Plainfield Rescue Squad argued that his client "is a volunteer nonprofit organization." Plaintiffs' counsel responded that the Squad is a for-profit entity. We cannot and should not resolve these factual disputes at this stage. We granted certification solely to interpret *N.J.S.A.* 26:2K–29—the statute on which the parties, trial court, and Appellate Division relied.

■ Even under the common law, generally, "[a] principal 'may be liable for an act as to which the agent has a personal immunity from suit.' " *Gardner v. Rosecliff Realty Co.*, 41 *N.J.Super.* 1, 7, 124 *A.*2d 30 (App.Div.1956) (quoting *Restatement of Agency* § 217(2) (1933)); *see also Volb v. G.E. Capital Corp.*, 139 *N.J.* 110, 121, 651 *A.*2d 1002 (1995) (" 'The principal has no defense because of the fact that . . . the agent had an immunity from civil liability as to the act.' ") (quoting *Restatement (Second) of Agency* § 217(b) (1957)); *Whitfield v. Bonanno Real Estate Group*, 419 *N.J.Super.* 547, 563 n. 6, 566–67, 17 *A.*3d 855 (App.Div.2011) (recognizing that "[t]he *Restatement (Third) of Agency* (2006) did not adopt a similar provision" but following *Volb*).

In addition, viewing *N.J.S.A.* 26:2K–29 within the context of surrounding statutes shows that the Legislature was well aware of how to draft a law immunizing a rescue squad as an entity. It did so for rescue squads providing advanced life support services. *N.J.S.A.* 26:2K–14 was enacted approximately one year before passage of *N.J.S.A.* 26:2K–29. *See L.* 1984, *c.* 146, § 8. *N.J.S.A.* 26:2K–14 provides that

> [n]o . . . first aid, ambulance or *rescue squad,* or *officers and members of a rescue squad,* shall be liable for any civil damages as the result of an act or the omission of an act committed while in training for or in the rendering of advanced life support services in good faith and in accordance with this act.
> [*N.J.S.A.* 26:2K–14 (emphasis added).]

The language of this statute is similar to that of *N.J.S.A.* 26:2K–29—with one critical exception. *N.J.S.A.* 26:2K–14 immunizes both rescue squads and "officers and members of rescue squads." *See* Sponsors' Statement, *Statement to Assemb. Bill No. 551* (April 30, 1984) (noting that immunity under *N.J.S.A.* 26:2K–14 is conferred on both "individuals and organizations"). The Legislature evidently intended to shield rescue squads rendering advanced life support services, and *not* rescue squads rendering intermediate life support services.

The legislative history of *N.J.S.A.* 26:2K–29 drives home this point. The initial Assembly and Senate versions of *N.J.S.A.* 26:2K–29 each contained immunity provisions similar to that of

*N.J.S.A.* 26:2K–14: "No EMT-intermediate ... first aid, ambulance or rescue squad, or officers and members of a rescue squad, shall be liable. ..." *S. Bill No. 1806* § 9 (May 14, 1984); *Assemb. Bill No. 2005* § 9 (May 14, 1984). The Legislature rejected that language and enacted the legislation as it appears today. *See L.* 1985, *c.* 351, § 10.

Thus, the legislative history supports our conclusion that, based on the plain-language of *N.J.S.A.* 26:2K–29, a rescue squad, as an entity, is not granted immunity from liability.

### B.

The Rescue Squad contends that, as a matter of public policy, we should read *N.J.S.A.* 26:2K–29 as providing immunity to it. The Squad would have us engraft onto the statute an immunity provision that the Legislature pointedly omitted. That we cannot do. We are charged with interpreting a statute; we have been given no commission to rewrite one. The public policy of the Legislature is expressed in the language of *N.J.S.A.* 26:2K–29. The Legislature chose to provide immunity to volunteer rescue squads, *N.J.S.A.* 2A:53A–13.1, and to rescue squads rendering advanced life support services, *N.J.S.A.* 26:2K–14. By the clear language of *N.J.S.A.* 26:2K–29, the Legislature chose not to provide immunity to rescue squads, as entities, rendering intermediate life support services. If the failure to provide immunity to such rescue squads was an oversight, any corrective measure must be taken by the Legislature.

### V.

We reverse the judgment of the Appellate Division affirming the trial court's grant of summary judgment in favor of the Rescue Squad. We hold that *N.J.S.A.* 26:2K–29 does not provide immunity to the Rescue Squad as an entity. We remand to the trial court for proceedings consistent with this opinion.

*For reversal and vacation*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS and PATTERSON—5.

*Not Participating*—Judge WEFING (temporarily assigned).