NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4629-12T4

IN RE CHALLENGE OF CONTRACT
AWARD SOLICITATION #13-X-22694
LOTTERY GROWTH MANAGEMENT
SERVICES.

_____

**APPROVED FOR PUBLICATION**

**July 3, 2014**

**APPELLATE DIVISION**

Argued March 24, 2014 — Decided July 3, 2014

Before Judges Yannotti, Ashrafi, and Leone.

On appeal from the New Jersey Department of
the Treasury, Division of Purchase and
Property.

Justin Schwam argued the cause for
appellants Communications Workers of
America, AFL-CIO, and CWA Locals 1033 and
1037 (Weissman & Mintz, L.L.C., attorneys;
Mr. Schwam, on the brief).

Beth Leigh Mitchell, Assistant Attorney
General, argued the cause for respondent New
Jersey Department of Treasury, Division of
Purchase and Property (John J. Hoffman,
Acting Attorney General, and Gibbons, P.C.,
attorneys; Ms. Mitchell, on the brief; Peter
J. Torcicollo, Damian V. Santomauro, and
Kevin W. Weber, on the brief).

Gage Andretta argued the cause for
respondent Northstar New Jersey Lottery
Group, LLC (Wolff & Samson, P.C., attorneys;
Mr. Andretta and David M. Dugan, on the
brief).

The opinion of the court was delivered by

ASHRAFI, J.A.D.

In this appeal, a union and its locals that represent State employees challenge the constitutionality of the State's award of a long-term contract to a private company to provide sales and marketing services and to manage other functions of the New Jersey State Lottery. The Communications Workers of America, AFL-CIO, and CWA Locals 1033 and 1037 (collectively "the CWA") represent employees of the New Jersey Department of the Treasury's Division of the State Lottery ("Lottery Division"). On behalf of their members, they filed a protest of the contract award to Northstar New Jersey Lottery Group, LLC. The Director of the Treasury Department's Division of Purchase and Property ("DPP") rejected the protest in a detailed written decision.

On appeal to this court, the CWA contends that the contract violates the amendment of the New Jersey Constitution that authorized the State Lottery as well as a statutory provision of the State Lottery Law, N.J.S.A. 5:9-1 to -25. It also argues that Northstar's bid proposal did not conform to the bid specifications because it included an unauthorized management fee in addition to other compensation to be paid to Northstar. We reject these arguments and affirm the Director's decision.

I.

Looking for ways to increase revenues from the Lottery Division, the State Treasurer issued a Request for Information

("RFI") on December 7, 2011, soliciting "recommendations to improve any or all aspects of the Lottery's operation including: sales and marketing strategies and functions; product offerings; back office operations; information technology; and financial management."  The RFI provided some background information about the New Jersey State Lottery:

> The Lottery has a staff of approximately 150 employees organized around seven work functions, including: Administration; Operations; Management Information Systems; Marketing; Sales; Security, Audit, Licensing; and Finance.
>
> . . . .
>
> Sales revenues for [its current games] totaled over $2.6 billion for the fiscal year ending June 30, 2011.  For the same period, administrative expenses totaled $22.3 million; sales commissions totaled $147 million, vendor fees totaled $33 million, and prize expenses totaled $1.544 billion.  As a result, the Lottery was able to contribute $930 million to education and institutions on a net revenue basis.

The RFI also explained that the lottery had three existing contracts with third-party vendors, covering products and services for advertising, instant games, and online games, and it stated that "[a]ny proposed services or solutions may include the use of third party providers."

The Treasury Department's Review Committee received several substantive responses to the RFI that included the possible

privatization of lottery functions.  From these responses, the Lottery Division and DPP developed and issued on August 10, 2012, an advertised Request for Proposal ("RFP") soliciting bids for a contract for "Lottery Growth Management Services."  The fifteen-year "Services Agreement" would be for management services, goods, and equipment for the sales and marketing operations of the New Jersey State Lottery.  Thirteen addenda were later added to the RFP in response to questions from potential bidders and as additional information.

As "Manager" for the State lottery, the successful bidder would "run the Lottery's sales and marketing operations, oversee its product development and sales channels and maintain and update its information technology systems, website and social media presence."  At the time of the solicitation, the Lottery Division or one of its subcontractors was performing these duties.

According to the RFP's Section 1.2.1 (OVERVIEW), "the State's primary objective" was for the Manager to "strengthen and maximize the future funding for State institutions and State aid for education by maximizing a growing revenue stream in a responsible manner."  The overview further described the Manager's duties to include "the provision and maintenance of

the Central Gaming System, game development, supply of goods and services, marketing and advertising."

Together with its Appendix A, the RFP's Section 3.0, entitled "SCOPE OF WORK AND OPERATIONAL RESPONSIBILITIES OF THE MANAGER," provided a more detailed "Description of Services" to be performed by the Manager: (1) maintaining and modifying lottery software and websites; (2) providing data and reports to the Division; (3) assuming control over the installation of retail hardware, instant ticket vending machines, and establishing an on-line portal for internet gaming; (4) game design and development; (5) distribution and warehousing services; (6) recruitment, training and supervision of lottery retailers, including recommended commissions for these retailers; (7) most aspects of lottery marketing; (8) maintaining customer service centers; (9) developing, operating and maintaining a responsible gambling program; (10) engaging subcontractors, and preparing, negotiating and monitoring their contracts; and (11) maintaining compliance with state regulations, and preparing game rules.

The RFP required each bid proposal to include a technical proposal, a transition plan, a detailed account of the qualifications and experience of the bidder, a business plan, and net income targets.

A-4629-12T4

The RFP's financial model had three elements: an accelerated guarantee payment by the successful bidder to the State, net income targets, and shortfall payments. The winning vendor was required to make a one-time $120 million payment to the State upon executing the Services Agreement. The vendor was also required to propose net income targets for each contract year, and the contract would require shortfall payments to the State, within capped limits, for any year in which the vendor failed to meet the base income targets.

The vendor would receive compensation from the State calculated as a rising percentage of the year's net income in excess of the listed contract year's base level income set forth in the RFP. The vendor's compensation would be capped at 5% of the contract year's total lottery net income.

At least 30% of the total lottery revenues would have to be contributed to the general fund for State institutions and State aid for education. If necessary, the vendor's compensation would be reduced to guarantee the 30% contribution.

With respect to decision-making authority, the RFP expressly declared in Section 1.2.3, entitled OVERSIGHT BY THE DIVISION OF LOTTERY:

> At all times, the Lottery will continue to be conducted under the control and oversight and regulatory and step-in powers of the Division of Lottery . . . . The Division of

Lottery will exercise actual control and oversight over all significant business decisions, and will retain the authority to direct and countermand the operating decisions of the Manager as described in the Services Agreement.

Only one vendor, Northstar, submitted a bid proposal. Northstar is a joint venture comprised of: (1) GTECH Corporation, an operator and provider of gaming technology and services based in Rhode Island, which had an existing contract with New Jersey's Lottery Division; (2) Scientific Games International, a provider of lottery end-to-end gaming solutions based in Georgia; and (3) OSI LTT NJ Holdings Inc., a pension fund of the Ontario Municipal Employees Retirement Systems.

DPP reviewed Northstar's bid for compliance with the RFP's mandatory elements, and then sent the bid to DPP's Evaluation Committee for close review. On January 28, 2013, the Evaluation Committee requested clarification from Northstar regarding: (1) Northstar's Technology Plan; (2) the variance between Northstar's projected net income targets and what Northstar had termed its Pro Forma Net Income Calculations; and (3) a proposed "Management Fee" included in Northstar's bid submission. On January 31, 2013, Northstar submitted its responses with attachments, and a few days later gave an oral presentation to the Evaluation Committee.

By letter dated February 4, 2013, the Evaluation Committee requested that Northstar submit a best and final offer ("BAFO"), increasing its net income targets and withdrawing the proposed management fee. On February 7, 2013, Northstar submitted increased net income targets by a cumulative value of $48.5 million and reduced its management fee to $4.75 million.

On March 8, 2013, DPP met with Northstar to clarify the BAFO response and requested a second BAFO. After Northstar declined to modify its BAFO, the technical advisor to the Evaluation Committee requested additional information about the management fee. Northstar's responses included confirmation that invoices for the management fee would be prepared and presented in accordance with the terms of the Services Agreement. On March 27, 2013, DPP requested a final BAFO, and Northstar responded with increases to its net income targets by an aggregate of $3.4 million.

On April 2, 2013, the Evaluation Committee submitted its report and recommended that the contract be awarded to Northstar. It found "Northstar's proposal meets the objectives of the RFP," and "that award of a contract to Northstar would provide the State with proven and diversified lottery management capabilities, comprehensive U.S. and international lottery experience, expertise within the lottery industry, and a

management team with extensive New Jersey and global lottery-industry experience."  Regarding the management fee, the Evaluation Committee concluded it "is a justifiable expense, necessary and reasonable for Northstar to achieve its business plan."

After DPP issued a notice of intent to award the contract to Northstar, the CWA filed its protest on April 17, 2013. Northstar submitted a reply, and the parties to the protest made an oral presentation before DPP's Director on May 3, 2013, and final written replies a few days later.  On May 20, 2013, the DPP Director issued a forty-page written decision rejecting CWA's protest, refusing to grant a stay, and authorizing DPP to proceed with the contract.

On May 30, 2013, CWA filed a notice of appeal and then promptly moved before this court for an emergent stay of the awarding of the contract.  On June 11, 2013, we denied a stay but accelerated the appeal.  On June 20, 2013, the Services Agreement was executed, and sometime in 2013, Northstar paid $120 million to the State Lottery Fund and began implementing the contract.

## II.

As a preliminary matter, DPP argues that the CWA lacked standing to protest the awarding of the contract on

constitutional and statutory grounds after Northstar submitted its bid and the DPP accepted it. DPP argues those grounds could only be raised as a protest to the RFP before a bid was submitted. In response, the CWA cites In re Protest of Award of New Jersey State Contract A71188 for Light Duty Automotive Parts, 422 N.J. Super. 275, 289 (App. Div. 2011), and contends that DPP cannot fault the CWA for failing to file a protest before the contract was awarded because, pursuant to N.J.A.C. 17:12-3.2, only vendors and potential bidders could protest the bid specifications. It cites the same case and O'Shea v. New Jersey Schools Construction Corporation, 388 N.J. Super. 312, 318 (App. Div. 2006), in support of its argument that New Jersey taxpayers, and organizations whose members include New Jersey taxpayers, have standing to make a post-bid challenge to the awarding of a public contract. See also Loigman v. Twp. Comm. of Middletown, 297 N.J. Super. 287, 295-96 (App. Div. 1997) ("Generally, taxpayer intervention is appropriate where there are claims of fraud or corruption, or other instances of illegalities and ultra vires acts . . . [and] claims of illegal bidding procedures." (citations omitted)).

Because DPP has not argued that a post-bid protest may only be brought by an individual taxpayer, we will not address whether an organization comprised of New Jersey taxpayers has

standing to protest the contract award and pursue an appeal. Given New Jersey's traditionally liberal view of standing to seek judicial remedies, see, e.g., Jen Elec., Inc. v. Cnty. of Essex, 197 N.J. 627, 645 (2009) (citing N.J. Builders Ass'n v. Mayor of Bernards Twp., 219 N.J. Super. 539 (App. Div. 1986), aff'd, 108 N.J. 223 (1987)); Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 107-12 (1971), we reject DPP's contention that the CWA acted too late in protesting the contract on constitutional and statutory grounds.

## III.

We begin with a brief history of the New Jersey State Lottery, its constitutional authorization, and the statutory provisions that control its administration and operations.

## A.

### Constitutional Authorization and Creation of the Lottery

Lotteries existed in New Jersey in the early history of this State. New Jersey's Constitution of 1844 banned them, stating that "no lottery shall be authorized by this state; and no ticket in any lottery not authorized by a law of this state shall be bought or sold within the state." N.J. Const. of 1844 art. IV, § 7, ¶ 2. In 1897, an amendment of that constitution prohibited gambling entirely. With the exception of parimutuel betting at horse racing tracks, which was authorized in 1939,

11

the prohibition on gambling was carried into New Jersey's current Constitution adopted in 1947. See In re Petition of Casino Licenses for Approval of New Game, Rulemaking & Auth. of a Test, 268 N.J. Super. 469, 472 (App. Div.), aff'd o.b., 138 N.J. 1 (1993). The 1947 gambling ban required a majority vote of the people to authorize by constitutional amendment any exception.[1] Such exceptions were made in 1953 for bingo games and raffles held by charitable, religious, and other non-profit organizations. N.J. Const. art. IV, § 7, ¶¶ 2(A) and 2(B).

In February 1969, the Legislature resolved in a concurrent resolution to put the question of establishing a State lottery to the voters. Assemb. Con. Res. 32, 193rd Legis. Sess. (1969). In the general election of November 1969, a majority of voters approved the constitutional amendment to permit a State lottery by a vote of 81.4% to 18.6%. The amendment stated:

---

[1] The 1947 Constitution states:

> No gambling of any kind shall be authorized by the Legislature unless the specific kind, restrictions and control thereof have been heretofore submitted to, and authorized by a majority of the votes cast by, the people at a special election or shall hereafter be submitted to, and authorized by a majority of the votes cast thereon by, the legally qualified voters of the State voting at a general election . . . .
>
> [N.J. Const. art. IV, § 7, ¶ 2.]

A-4629-12T4

> It shall be lawful for the Legislature to authorize <u>the conduct of State lotteries</u> restricted to the selling of rights to participate therein and the awarding of prizes by drawings when the entire net proceeds of any such lottery shall be for State institutions and State aid for education . . . .
>
> [<u>N.J. Const.</u> art. IV, § 7, ¶ 2(C) (emphasis added).]

The Legislature then created a New Jersey State Lottery Planning Commission ("Planning Commission") and directed it "to formulate a report, including legislation and an administrative program for the conduct of a State Lottery, for submission to the Governor and the Legislature." <u>Joint Res. No. 11</u>, 193rd Legis. Sess. (1969). The Planning Commission was to study lotteries operated in other states "with the ends in view of devising a lottery system of broad appeal with frequent drawings, effective controls and such other features which will achieve, to the maximum practicable extent, the objectives of the constitutional amendment." <u>Ibid.</u>

Although the Planning Commission's research benefitted from the experience of other states, its report to the Legislature stated that the information it had gathered was "not adequate . . . to define clearly the optimal lottery structure for New Jersey." It added that "actual operating experience in this State" was necessary to devise the best system, and "[t]he

13

structure of this lottery, and the legislation which is to govern its operation, must be adaptable to such new information as may become available in the years ahead." Report of the State Lottery Planning Commission at iv (Feb. 9, 1970).[2]

The Planning Commission divided the general "issues" to be addressed by the Legislature into two categories: the administrative structure and the operating structure of the lottery. With respect to the administrative structure, the Planning Commission stated:

> There are two major criteria which must be met by the administrative organization of the lottery. First . . . to . . . attract the confidence of the public. . . . Second . . . to achieve the goals of the lottery operation, as set by collective public opinion . . . .
>
> [Id. at 4.]

In pursuit of these objectives, the Planning Commission proposed that the Legislature should:

> Establish a lottery division in the Department of the Treasury, to be administered by a five-man commission and a full-time operating director. These officials will be appointed by, and accountable to, the Governor of this State, who shall have veto power over the decisions of said commission. This administrative structure is designed to ensure the complete

---

[2] Available at http://dspace.njstatelib.org:8080/xmlui/ bitstream/handle/10929/32330/g1911970.pdf?sequence=1.

integrity of, and full public confidence in, the operation of the State lottery.

[Id. at v.]

Also, "to ensure the integrity of the lottery," the Planning Commission recommended "that the State Auditor be required to conduct an annual post-audit of the transactions and accounts of the lottery division." Id. at 7.

Addressing the future financial success of the lottery, the Planning Commission stated that the lottery "must be operated as a public business enterprise" if it is to attain its full potential as a source of revenue. Ibid. It recognized that "promotion and advertising will be required." Ibid.

The Planning Commission placed the task of making policy in the hands of the five-person commission it proposed, but a Lottery Director would exercise executive authority and operate the lottery:

> A full-time operating director will likewise be appointed by the Governor, with the advice and consent of the Senate. To a large extent, the task of implementing a successful lottery system in the State will be his. The director must, of course, be an able administrator. However, he must be an able businessman in other respects as well, particularly to the extent that a successful lottery will require successful marketing.
>
> [Ibid. (emphasis added).]

15                                          A-4629-12T4

With respect to the lottery's operating structure, the Planning Commission discussed a number of specific issues:

> A number of decisions must be made before a lottery can be put into operation . . . includ[ing] the frequency with which drawings should take place, the manner of determining winners, the prices of lottery tickets, the structure of prizes, the form of ticket distribution, the types and amounts of promotion and advertising, and how winners shall be notified and paid.
>
> [Id. at 4-5.]

To the Planning Commission, flexibility was a vital feature in addressing the operating structure of the lottery. Id. at 5. Its report stated that "the authority to specify and modify as required the operating structure and characteristics of the lottery should be delegated to the lottery commission rather than specified in detail by the legislation." Id. at 8. Thus, the Planning Commission proposed that any legislation should "[p]rovide sufficient flexibility to the lottery division so that it may make and implement those decisions which appear necessary to best ensure that the lottery will succeed in achieving its goals." Id. at vi.

The Planning Commission explained its reasoning further:

> Only experience and experimentation in this State can provide the information which is required, and it is for this reason that this [Planning] Commission recommends most strongly that the permanent commission and director which it proposes be allowed the

16

> maximum possible flexibility commensurate
> with preserving the full trust and
> confidence of the citizens of this State.
> In particular, it is important to avoid
> unnecessary rigidities in the legislation
> which will inhibit the lottery commission's
> ability to modify the lottery so as to
> increase public interest and participation.
>
> [Id. at 5 (emphasis added).]

Again with an eye to the future, the Planning Commission mentioned one example of likely participation by private entities in operating the lottery: "increasing mechanization of the lottery . . . might be performed more efficiently by a private contractor than by the State."  Id. at 28.

The Planning Commission's proposed legislation implementing these recommendations was passed by the Legislature with few changes, and the State Lottery had its first drawing on January 7, 1971.

B.

State Lottery Law, N.J.S.A. 5:9-1 to -25

The Legislature's purpose in enacting the State Lottery Law is stated in N.J.S.A. 5:9-2:

> This act is enacted to implement the
> amendment of Article IV, Section VII,
> paragraph 2, of the Constitution of New
> Jersey, approved by the people in the
> general election of November, 1969, and to
> carry out the mandate thereof by establish-
> ing a lottery to be operated by the State,
> the entire net proceeds of which are to be

> used for State institutions and State aid
> for education.
>
> [(emphasis added).]

The language of N.J.S.A. 5:9-2 has not changed since it was proposed by the Planning Commission and enacted by the Legislature in February 1970. L. 1970, c. 13, § 2.

The State Lottery Law "established in the Department of the Treasury a Division of the State Lottery, which shall include a State Lottery Commission and a director." N.J.S.A. 5:9-4. The powers and duties of the Lottery Commission were set forth in N.J.S.A. 5:9-7. Among them was the promulgating of rules and regulations to implement the constitutional "mandate of the people" and to "produce the maximum amount of net revenues for State institutions and State aid for education." In addition to a myriad of other subjects, the statute authorizes the Lottery Commission to establish rules and regulations for:

> the payment of costs incurred in the
> operation and administration of the lottery,
> including the expenses of the division and
> the costs resulting from any contract or
> contracts entered into for promotional,
> advertising or operational services or for
> the purchase or lease of lottery equipment
> and materials . . . .
>
> [N.J.S.A. 5:9-7(a)(11)(b) (emphasis added).]

The Lottery Director's powers and duties are set forth in N.J.S.A. 5:9-8. They include supervising and administering the

A-4629-12T4

operation of the lottery, appointing or hiring employees of the Lottery Division, advising the Lottery Commission, and certifying each month to the State Treasurer and the Lottery Commission the revenues, expenses, and prize disbursements of the lottery. Ibid. In addition, subsection (h) of the statute specifically authorized the Lottery Director to enter into contracts for the operation and promotion of the lottery. L. 1970, c. 13, § 8 (codified at N.J.S.A. 5:9-8(h)).

In 1983, the Legislature amended N.J.S.A. 5:9-8(h), which now reads:

> Subject to the approval of the commission and the applicable laws relating to public contracts, to act on behalf of the commission as using agency with respect to purchases made by the Division of Purchase and Property of goods and services required in the operation of the lottery.
>
> [L. 1983, c. 60, § 2 (codified at N.J.S.A. 5:9-8(h)) (emphasis added).]

The question on this appeal is whether a contract as broad-ranging as that awarded to Northstar for fifteen years is within the authorized powers of the Lottery Director and the Lottery Division.

IV.

The CWA alleges the State's contract with Northstar unlawfully privatizes many of the Lottery Division's duties currently being performed by State employees. It contends the

contract violates the State Constitution because the 1969 amendment authorizes only "the conduct of State lotteries," which the CWA argues means a lottery "conducted by the State." Similarly, it contends the contract violates the State Lottery Law because N.J.S.A. 5:9-2 authorizes only "a lottery to be operated by the State," not by a private entity.

The CWA does not argue that the Lottery Division has no power whatsoever to contract with outside vendors. It acknowledges that for decades the Lottery Division has contracted with privately-owned vendors for services such as advertising, ticket printing, and instant and online game management. See In re Protest of Award of On-Line Games Prod. & Operation Servs. Contract, Bid No. 95-X-20175, 279 N.J. Super. 566 (App. Div. 1995) (five-year contract to implement and operate on-line gaming system). Instead, the CWA argues that the sales and marketing operations of the Lottery Division are non-delegable functions of the State and may not legally be conducted by a private entity. It contends the line has been crossed with this contract, and that the Lottery Division and the Lottery Director have relinquished "operation" of the lottery to a private, profit-making interest.

DPP and Northstar respond that the Lottery Division and Director continue to operate the lottery because they retain

tight control over Northstar and any other subcontractor involved in the implementation of the disputed contract. Respondents rely on the history of the State Lottery Law and the experience and decisions of other jurisdictions that have addressed similar issues in awarding contracts to private entities. They contend that neither the State Constitution nor the State Lottery Law requires that all functions of the lottery be performed by State employees, and that there is no logic to the CWA's argument that the sales and marketing functions cross a line when the Lottery Division has contracted lawfully in the past with respect to other functions.

As to management functions that the contract delegates to Northstar, respondents emphasize that a number of these functions are already being performed by private vendors and that the policy-making and overall administrative functions of the lottery remain with the Lottery Commission and the Lottery Director. They add that oversight, supervision, and veto power over Northstar's business decisions are prominently retained by the Lottery Division through the Services Agreement, thus making the Lottery Division, not Northstar, the operator of the lottery.

Focusing on the word "operated" in N.J.S.A. 5:9-2, both sides argue that its meaning is plain, but each side claims the

plain meaning leads to its own understanding of the word in the context of this dispute.  The CWA asserts that the only possible interpretation of N.J.S.A. 5:9-2 is: "The creation of a State Lottery, operated solely by the State, by State workers, with proceeds flowing entirely to the State."  It argues that the phrase "operated by the State" is distinguishable from "regulation and control by" the State, and that it is not enough that the Division retains oversight over Northstar's actions and decisions.

The CWA cites Atlantic City Racing Association v. Attorney General, 98 N.J. 535, 546 (1985), to support its claim that all provisions affecting an exception to the constitutional ban on gambling must be narrowly interpreted and must follow the intent of the original drafters.  It objects to any reliance on judicial decisions from other jurisdictions on the ground that the laws of other states are distinguishable from New Jersey's unique constitutional and statutory provisions applicable to the lottery.  Instead, the CWA asserts that we should compare our lottery laws to our own Casino Control Act, N.J.S.A. 5:12-1 to -233, where the State exercises only regulatory control over the operations of privately-owned casinos.  By that comparison, the CWA contends the Legislature intended to require more than just regulatory control and oversight of privately-owned entities

22                                          A-4629-12T4

when it enacted the State Lottery Law and required the State to "operate" the lottery.

DPP responds that the CWA has inserted "solely" into the wording of N.J.S.A. 5:9-2 as a limitation on how the Lottery Division may "operate" the lottery, but the statute does not contain that word and is not so restricted. DPP and Northstar emphasize many specific provisions of the Services Agreement to demonstrate the level of decision-making control that the Lottery Division retains and the close oversight and supervision of the Manager's activities that will remain in the hands of the Lottery Director and the Lottery Commission. They also point out that the Lottery Commission will continue to make all policy decisions and the Lottery Division will retain many functions of the lottery. Among the retained functions, the drawing of winning tickets, identifying winners, and awarding prizes remain functions of the Lottery Division and are not within the scope of duties of the Manager under the Services Agreement.

Although we ordinarily give substantial deference to an agency's decision to award or reject a bid proposal, Keyes Martin & Co. v. Dir., Div. of Purchase & Prop., 99 N.J. 244, 252 (1985); On-Line Games, supra, 279 N.J. Super. at 591-92, the issue before us is one of constitutional and statutory interpretation, to which we apply a plenary standard of review.

23                                                    A-4629-12T4

See Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012); Zabilowicz v. Kelsey, 200 N.J. 507, 512-13 (2009).

The court's "task . . . is to determine and effectuate the Legislature's intent." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009). Our analysis begins with the words of the enactment, which are to be given their generally accepted meaning, and are to be read in context of the legislation as a whole. Ibid.; DiProspero v. Penn, 183 N.J. 477, 492 (2005).

When the Legislature's language is clear and unambiguous, and subject to only one interpretation, we apply the statute's plain meaning. Bosland, supra, 197 N.J. at 553-54; DiProspero, supra, 183 N.J. at 492-93; O'Connell v. State, 171 N.J. 484, 488 (2002). But when the statutory language is ambiguous and subject to more than one reasonable interpretation, we must look to extrinsic evidence, such as legislative history, judicial interpretation, and rules of statutory construction. Bosland, supra, 197 N.J. at 553-54; DiProspero, supra, 183 N.J. at 493-94; State v. Fortin, 178 N.J. 540, 607 (2004).

In our view, the phrases "the conduct of State lotteries" in the constitutional amendment and "operated by the State" in N.J.S.A. 5:9-2 are too ambiguous to resolve the dispute in this appeal without resort to extrinsic sources. We agree with DPP's assertion that the CWA's plain meaning argument adds an extra,

24

modifying term to these phrases, that is, a requirement that all State Lottery functions be performed solely or exclusively by State employees. On the other hand, the constitutional and statutory phrases are not meaningless, and ultimately the lottery must be conducted and operated by the State, and not by a private entity.

Looking at extrinsic evidence of the Legislature's intent, it is clear from the Planning Commission's report that flexibility was intended in developing optimal means of operating the lottery through experiment and experience. Viewing administration of the lottery from a broad perspective, the Planning Commission envisioned a structure that included policy-making and overall responsibility for the integrity of the State Lottery and for accomplishment of the constitutional objectives. As to the lottery's operating structure, the Planning Commission considered the more immediate business decisions pertinent to developing and managing a successful lottery and urged flexibility and room for modification. It recognized that certain functions would be contracted out to private enterprise. The State Lottery Law enacted by the Legislature in 1970 essentially mirrored the proposed legislation recommended by the Planning Commission, and

A-4629-12T4

therefore, the Legislature adopted the Planning Commission's views and objectives.

Because the State Lottery must retain the confidence of the public, the State Lottery Law must be read to maintain in the Lottery Commission and the Lottery Director the power to determine policy and to make major business decisions. Those State officials are answerable to the Governor and to the Legislature. However, we do not read the State Lottery Law as requiring that day-to-day functions of the lottery, including management functions, must be performed only by State employees. Nor do we find a viable distinction in the sales and marketing functions of the Lottery Division with other functions that have historically been conducted through contracting with privately-owned, profit-making vendors. Indeed, N.J.S.A. 5:9-7(a)(11)(b) specifically anticipates that the State can issue contracts "for promotional, advertising or operational services."

Other jurisdictions have reached the same conclusion when considering similar issues regarding the authority of a state agency to delegate operational functions of the state lottery to private entities, or multi-state entities that operate games such as Mega Millions. See State ex rel. Six v. Kansas Lottery, 186 P.3d 183, 189-94 (Kan. 2008); Dalton v. Pataki, 835 N.E.2d

1180, 1197-98 (N.Y.), cert. denied, 546 U.S. 1032, 126 S. Ct. 739, 163 L. Ed. 2d 571 (2005).[3]

As DPP and Northstar point out, the Services Agreement contains many provisions retaining control of the lottery's operation with the Lottery Division and the Lottery Director. Section 1.1 confirms as a purpose of the Services Agreement that the State and the Lottery Division will "continu[e] to conduct and maintain oversight and control over the Lottery." Section 2.2 describes the general responsibilities of the Lottery Division to:

> continue to have actual control and oversight over the conduct of all Lottery operations by retaining the authority to direct or countermand Manager's operating decisions, maintaining ready access to information regarding all aspects of Lottery operations, and retaining ownership of all Lottery assets including all State Intellectual Property.

Section 5.1, entitled "Governance," requires Northstar to obtain approval of the Lottery Division before making "any

---

[3] See also U.S. Department of Justice, Office of Legal Counsel, "Scope of Exemption Under Federal Lottery Statutes for Lotteries Conducted by a State Acting Under the Authority of State Law" (Oct. 16, 2008) (concluding that a state could retain a vendor to perform lottery management services without violating federal law, which prohibits interstate advertisement or promotion of lotteries except when conducted by a state under its laws, 18 U.S.C. §§ 1307(a)(1), 1307(b)(1), 1953(b)(4)) available at http://www.justice.gov/olc/opiniondocs/state-conducted-lotteries101608.pdf.

material change from those business practices and decisions already Approved by the Division of Lottery and/or the State." The related Schedule 5.1 of the Services Agreement, entitled "Governance Protocols," states that "[t]he Division of Lottery must exercise actual control over all <u>significant business decisions</u> made by Manager at all times." (emphasis added). It specifically provides "Unconditional Veto Power" to the Lottery Director over any decision of Northstar as the Manager. Describing "actual control" by the Lottery Division as "fundamentally imperative to a fully-compliant governance structure," the Services Agreement states: "[T]he Parties expressly agree that the Division of Lottery . . . shall have the sole, absolute, and unconditional right to veto or countermand, with or without conditions, any action taken by Manager whatsoever . . . ."

Also, Section 13.2 permits the Lottery Division to terminate the agreement "for convenience" upon ninety days' notice to Northstar and payment of existing obligations under the agreement and a termination fee. In the event of such termination, the State is not liable to Northstar for loss of future profits.

These provisions demonstrate that the lottery remains a State operation, with certain functions and duties delegated to

a private entity.  In sum, we conclude that the Northstar contract is not a violation of the constitutional amendment that authorized our State lottery or the State Lottery Law.

V.

The CWA contends the contract must be rebid because Northstar's annual management fee represents an unlawful material deviation from the RFP's bid specifications.  It claims that the management fee of $4.75 million per year is for services beyond the RFP's scope of work of the Manager, and that its inclusion in Northstar's bid proposal and acceptance by DPP is a deviation contrary to the salutary purposes of the competitive bidding process.

As we previously stated, we defer to DPP's determination to award or reject a bid proposal.  Keyes Martin & Co., supra, 99 N.J. at 252; On-Line Games, supra, 279 N.J. Super. at 591-92. Where, as in this case, the question is whether a bid deviated from material requirements of the RFD, the Director's decision is tested by the "ordinary standards governing administrative action."  On-Line Games, supra, 279 N.J. Super. at 593.  More specifically, these standards include:

> whether the record contains substantial evidence to support the findings on which the agency based its action; and . . . whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not

reasonably have been made on a showing of
the relevant factors.

[Ibid. (quoting George Harms Constr. Co. v.
N.J. Tpk. Auth., 137 N.J. 8, 27 (1994).]

Initially, the DPP Director was required to decide whether Northstar's bid deviated from the RFP. See id. at 594. "If there is no deviation, the bid must be deemed conforming. If there is a deviation, a decision must be made as to whether it is material and can be waived." Ibid. If a deviation is material and non-waivable, the inquiry is:

"whether the effect of a waiver would be to
deprive [the agency] of its assurance that
the contract will be entered into, performed
and guaranteed according to its specified
requirements, and second, whether it is of
such a nature that its waiver would
adversely affect competitive bidding by
placing a bidder in a position of advantage
over other bidders or by otherwise under-
mining the necessary common standard of
competition."

[Id. at 594-95 (quoting Twp. of River Vale
v. R.J. Longo Constr. Co., 127 N.J. Super.
207, 216 (Law Div. 1974)).]

In its original bid proposal, Northstar included under the category of its management expenses a $5 million "Management Fee" that would increase by two percent annually. The Evaluation Committee requested clarification and subsequently asked Northstar to withdraw the management fee from its proposal. In response, Northstar reduced the fee to $4.75

A-4629-12T4

million per year, and it increased its net income targets for the lottery by an aggregate of more than $50 million.

Northstar described the purpose of the management fee as follows:

> The annual Management Fee compensates Northstar for management services provided by its stakeholders to Northstar for the benefit of the Lottery. These management services are not separately accounted for in the supply contracts between Northstar and its stakeholders (GTECH and Scientific Games). . . .
>
> [T]hese management services include, but are not limited to:
>
> - Support from corporate personnel of Northstar's stakeholders related to:
>
>   o Application of international best practices.
>   o National retail chain business development and execution.
>   o Marketing activities and retail best practices (including data analytics, retailer design, and merchandising).
>   o Player loyalty management.
>   o Finance and tax support.
>   o Legal and compliance.
>   o Responsible gaming program support.
>
> - Governance duties performed by the Board of Directors.

Northstar reported that the management fee does not include any compensation for bonuses paid to the employees or personnel of the corporate stakeholders, and is not otherwise included in

A-4629-12T4

its overhead or subcontractor expenses. It assured the Evaluation Committee that it would submit monthly invoices for the management fee in accordance with the requirements of the Services Agreement, and subject to restrictions on expenses in excess of budgeted amounts. It stated in retrospect that the management fee might have been better categorized as a subcontractor expense, although the subcontractor would be Northstar's own stakeholders. After further inquiry and investigation, the Evaluation Committee acceded to Northstar's inclusion of the management fee, finding the fee and its included services "a justifiable expense, necessary and reasonable for Northstar to achieve its business plan."

In her written decision, the DPP Director reviewed the facts and "conclude[d] that Northstar NJ's inclusion of a management fee is not an exception to the RFP, material or otherwise." She specifically found "that the management fee as clarified during the negotiations is an 'Operating expense' as that term was defined in the RFP," and that "the services to be performed in exchange for the management fee are within the scope of services outlined in Appendix A of the RFP."

The CWA claims the Director erred because the services covered by the management fee are outside the RFP's Scope of Work of the Manager. We disagree. The RFP's Section 3.0 (SCOPE

OF WORK AND OPERATIONAL RESPONSIBILITIES OF THE MANAGER)

includes the following provision:

> Except for those functions or services
> specifically defined in Schedule 2.2 of the
> Services Agreement (which are reserved by
> the Division of Lottery), Manager's
> functions and responsibilities shall
> include, <u>but not be limited to</u>, those
> functions and responsibilities set forth in
> Appendix A to the RFP and <u>such other
> functions which are an inherent, necessary
> or customary part of the functions and
> responsibilities associated with the Lottery</u>
> . . . .

> [(emphasis added).]

Northstar's description of the work associated with its management fee, to the extent not specifically described in the Services Agreement, can be categorized within Section's 3.0 catchall language. Northstar explained to the satisfaction of the Evaluation Committee and the DPP Director the reasons it needed to charge a separate fee for the management services of its stakeholders' corporate personnel in implementing its business plan for managing the lottery. Whether described as a management expense or a subcontractor expense, the DPP Director viewed the management fee as an operational expense of Northstar that was within the specifications of the RFP and would be accounted for in accordance with the terms of the Services Agreement. Furthermore, we note that DPP allowed the management fee only after it was reduced and Northstar increased its net

33

income targets. See State Contract A71188, supra, 422 N.J. Super. at 296 ("Courts have approved post-bid modifications to an awarded public contract when the public entity negotiates more favorable terms.").

The DPP Director properly exercised her discretion in determining that Northstar's bid proposal conformed to the bid specifications.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4629-12T4