JUSTICE ALBIN delivered the opinion of the Court.
**40 *998 Quaker Valley Farms, LLC (Quaker Valley) owns approximately 120 acres of deed-restricted farmland in Franklin Township, Hunterdon County. As part of New Jersey's Farmland Preservation Program, the State purchased an easement on the property that limits the use of the land to agricultural purposes. The deed of easement prohibits any activity on the property that is "detrimental to ... soil conservation," but permits the construction of "any new buildings for agricultural purposes." The tension between those impermissible and permissible activities is at the heart of the controversy in this case.
Quaker Valley excavated and leveled twenty acres of the farm previously used for the production of crops to erect hoop houses (temporary greenhouses) in which flowers would be grown. In the process, Quaker Valley destroyed the land's prime quality soil. The State Agriculture Development Committee (SADC) investigated Quaker Valley's excavation activities and concluded that Quaker Valley had violated its deed of easement and the Agriculture **41 Retention and Development Act (ARDA), N.J.S.A. 4:1C-11 to -48 -- one of the statutes implementing the Farmland Preservation Program.
The SADC brought an action in the Superior Court to enforce the restrictions placed on the use of Quaker Valley's farmland and to halt the further destruction of the property's premier quality soil. The trial court granted summary judgment in favor of the SADC, halting Quaker Valley's project and ordering the remediation of the despoiled land.
The Appellate Division reversed, finding that the imperative of soil conservation had to be reconciled with the permissible construction of buildings for agricultural purposes under both the deed of easement and the ARDA. The panel construed the deed of easement to permit the construction of hoop houses, "so long as the landowner conserves soil to the extent practicable." The panel remanded to the trial court to determine "whether [Quaker Valley] took the necessary steps, to the extent practicable, to conserve the soil disrupted by the land-grading activities."
We now conclude that the Appellate Division erred in overturning the grant of summary judgment in favor of the SADC. The incontrovertible evidence of record is that Quaker Valley permanently damaged premier soil on twenty acres of farmland protected by the deed of easement and the ARDA.
The preservation of high quality soil and open space for future generations is one of the chief aims of the Farmland Preservation Program. Although Quaker Valley had the right to erect hoop houses, it did not have the authority to permanently damage a wide swath of premier quality soil in doing so.
Quaker Valley crossed a threshold that clearly violated the deed and the ARDA. Nevertheless, those who own deed-restricted farmland must have well delineated guidelines or rules that will permit them to make informed decisions about the permissible limits of their activities. The State has yet to promulgate such guidelines or rules. The imperatives of due process require that **42 the State give farmers reasonable notice of the permissible agricultural uses of the land, particularly when there are seemingly conflicting provisions in a deed of easement. Farmers must know where the goalposts are set before the State burdens them with costly enforcement actions. *999 In this case, however, we hold that even under the existing law and the present deed, any reasonable person should have known that despoiling so much prime quality soil was an unauthorized activity. We remand to the trial court to continue with the remediation plan earlier ordered.
I.
A.
The State Agriculture Development Committee (SADC) is a state agency responsible for the enforcement of the Agriculture Retention and Development Act (ARDA), N.J.S.A. 4:1C-11 to -48. The ARDA is a legislative scheme that authorizes the "State and county organizations to coordinate the development of farmland preservation programs within identified areas where agriculture will be presumed the first priority use of the land." N.J.S.A. 4:1C-12(c). It is the county-level agriculture development boards, established under N.J.S.A. 4:1C-14, that are largely responsible for reviewing and approving applications to the Farmland Preservation Program. N.J.S.A. 4:1C-15 ; N.J.A.C. 2:76-6.5(a) to (e). The SADC is empowered to financially help a county purchase an easement on farmland for the purpose of preserving its agricultural use in perpetuity. See N.J.S.A. 4:1C-8 ; N.J.A.C. 2:76-6.5(f).
Quaker Valley owns approximately 120 acres of deed-restricted farmland property subject to the ARDA. In February 2008, the SADC filed in the General Equity Part of the Superior Court a verified complaint against defendants Quaker Valley and David Den Hollander, an owner and operator of Quaker Valley (collectively Quaker Valley). Shortly after the filing of the complaint, the **43 court allowed Hunterdon County and Franklin Township to intervene as plaintiffs with the SADC (collectively SADC).
The complaint alleges that Quaker Valley permanently damaged prime soil on twenty acres of the farm while in the process of excavating and leveling the land for the construction of seventy-two "greenhouse-type 'hoop' houses." The complaint also alleges that Quaker Valley's "destruction of the soil precludes its use for a variety of agricultural uses" and thus directly violates not only the deed of easement's command to conserve the soil, but also the ARDA. The SADC maintained that immediate action had to be taken to ensure that Quaker Valley did not cause "any further destruction of the soil profile of the site." As relief, the SADC sought a judgment halting Quaker Valley from further degrading the land and from constructing more hoop houses. The SADC also proposed the implementation of a remediation plan that would restore the soil to its original profile "to the extent possible."
Quaker Valley filed a counterclaim asserting, in part, that material terms of the deed of easement are vague and therefore unenforceable and that the SADC exercised its police powers to coerce, intimidate, and interfere with Quaker Valley's property rights in violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(b) and (c).
The SADC and Quaker Valley both moved for summary judgment. We recite the relevant facts from the summary judgment record.
B.
The Mathews family owned the 120-acre farmland in Franklin Township, Hunterdon County for over a hundred years, growing and harvesting corn, wheat, oats, soybeans, and hay. In 1989, Harold and Rosalie Mathews applied to the SADC to sell an easement on their property that would restrict its use to agricultural purposes. At the time of the application, approximately *1000 100 acres of the Mathews' farmland were actively used for crop production. Ultimately, the Hunterdon County Agricultural Development **44 Board selected the Mathews' property for inclusion in New Jersey's Farmland Preservation Program. The Mathews' property was chosen for the program, in part, because of the high quality of its soil -- described as "prime" soil -- which has the ingredients to produce a wide variety and high yield of crops.
In 1993, in consideration for a deed of easement, which restricts the use of the farm for only agricultural purposes, Hunterdon County paid the Mathews $402,680.07.[1] In 1997, Quaker Valley purchased the Mathews' farm for $500,000, subject to the deed of easement.[2]
C.
The meaning of the relevant terms of the deed of easement, in relation to one another, is the focal point of the dispute in this case. The terms of the deed of easement are lifted directly from a regulation promulgated by the SADC. N.J.A.C. 2:76-6.15. The easement terms give context to the events at issue.
Paragraph two of the deed requires that the land be "retained for agricultural use and production in compliance with [the ARDA] and all other rules promulgated by the [SADC]." Accord N.J.A.C. 2:76-6.15(a)(2). "Agricultural use" is defined through a non-exhaustive list of farm activities, which include the "production, harvesting, storage, grading, packaging, processing and the wholesale and retail marketing of crops, plants, animals and other related commodities **45 and the use and application of techniques and methods of soil preparation and management." Ibid.
Paragraph seven of the deed of easement mandates that landowners take no action that would be contrary to soil preservation: "No activity shall be permitted on the Premises which would be detrimental to ... erosion control[ ] or soil conservation, nor shall any other activity be permitted which would be detrimental to the continued agricultural use of the Premises." Accord N.J.A.C. 2:76-6.15(a)(7). Paragraph seven of the deed, however, must coexist with paragraph fourteen, which states that landowners "may construct any new buildings for agricultural purposes."Accord N.J.A.C. 2:76-6.15(a)(14).
D.
Quaker Valley operates a wholesale horticultural business, which produces plants for large retail outlets, such as Wal-Mart, Home Depot, and Kmart. Since at least 2001, Quaker Valley used a twenty-acre field of prime soil to grow chrysanthemums in pots on top of woven fabric laid on the land. In September 2007, Quaker Valley suffered a million-dollar-plus crop loss when a hailstorm damaged the exposed crop of chrysanthemums. To protect against such future losses, Quaker Valley decided to construct heated hoop houses to provide cover to its chrysanthemum crops.[3] Hoop houses are essentially temporary greenhouses with a metal frame and plastic *1001 covering. Unlike a traditional greenhouse, a hoop house has no concrete footing.
The sloped twenty-acre field presented a topographical problem for Quaker Valley because hoop houses, for reasons of safety and efficiency, are commonly constructed on level ground. As a result, Quaker Valley, which had previously constructed hoop houses on existing soil, for the first time altered the elevation of the land to accommodate new hoop houses. In preparation for the erection of **46 the hoop houses, Quaker Valley excavated the earth on the twenty-acre field, including the prime quality soil, and then leveled the ground.
In October 2007, a concerned neighbor reported the excavation and leveling activities on the Quaker Valley property to the SADC. The SADC assembled a team of experts to investigate the effects of Quaker Valley's project "on the agricultural resource value of the farm."[4] During a site visit to the twenty-acre field, the team found the displacement of large volumes of soil material. In some areas, Quaker Valley had cut or removed three to five feet and in other areas ten to twelve feet of soil. At some locations, the excavation of the soil had exposed the sandstone bedrock. The team of experts found that top-grade topsoil had been mixed with the rocky subsoil and stockpiled in large mounds. The team determined that Quaker Valley's excavation activities had destroyed a large amount of prime soil for a variety of agricultural uses.
Howard C. Smith, a State Resource Conservationist with the United States Department of Agriculture, Natural Resources Conservation Service, visited the Quaker Valley farm in February 2008. In a certification, he expressed his shock about what he observed. He stated, "[i]n all my experiences I have never seen the extent of destruction of soils to an ongoing farming operation as has occurred at the Quaker Valley Farm Site." He indicated that he was familiar with "other large-scale farmland cut[-]and[-]fill grading activities" where "the soil was carefully removed in layers and then stockpiled to the side" so that the land could be restored to its natural state. At Quaker Valley, Smith found "a cut-and-fill operation in which little soil was separated by layer, except some topsoil, and instead the layers of soil appeared **47 to have mixed together." He determined that it would be "impossible for all practical purposes to ever separate the component soil layers, or horizons, and reapply them to recreate the highly productive Prime soils which had previously existed."
In a report that he filed later, Smith noted that the soil on the farm was "formed over thousands of years and was destroyed in a matter of days." He concluded that the twenty-acre field could not be classified any longer as "Prime farmland soils."
Dr. William E. Palkovics, an expert in soil science and agronomy, filed a report with the SADC that set forth his findings on the harm caused by Quaker Valley's excavation activities. For purposes of his study, Dr. Palkovics divided a twenty-five-acre field into three areas. In each, he described the extent of the soil disturbance and the prospect of remediation. In area three, the soil removal was so complete that the underlying bedrock was exposed. In area two, "earthmoving ha[d] removed or altered the characteristics of the original soil," and Dr. Palkovics found topsoil "buried and intermixed with the fill and subsoil." In both areas, he concluded the *1002 soil was no longer suitable for crop production, and therefore he classified "the agricultural yield rating" as "zero." In area one, a five-acre tract, Dr. Palkovics noted that, although valuable topsoil had been stripped away, the subsoil remained intact. This area suffered "the least disruption" to its natural conditions.[5]
Dr. Palkovics discovered some of the topsoil stockpiled in two separate locations, but determined that "[m]uch of the natural physical internal soil properties that slowly develop over time [had] been destroyed." According to Dr. Palkovics, "it is not possible to fully restore the original agricultural productivity of the disturbed area by man-made means due to the massive **48 disruption of the original soil properties." He stated, however, that "a new soil profile can be constructed to restore some agricultural productivity."
Quaker Valley's expert, Laurel F. Mueller, a professional soil scientist, expressed her opinions in certifications, expert reports, and deposition testimony. She did not "dispute the collective opinion that soil profiles on the graded portions of this project's landscape have been permanently altered." Mueller maintained that the excavation and leveling activities had permitted the land "to support profitable, intensive agricultural business operations, which can take advantage of real estate attributes other than the underlying soil characteristics." Mueller claimed that although "agricultural productivity would be lost for row crops if no remediation steps were ever taken," agricultural productivity still could be achieved through "many forms of intensive agriculture ... such as greenhouses and hoop houses, for which this graded site is now suitable." Nevertheless, according to Mueller, "most of the topsoil was properly removed and stockpiled" and "not largely mixed during earthmoving operations." Last, Mueller concluded that the deed of easement was "inadequate to guarantee ... protection for land in private agribusiness ownership" because a number of agricultural uses were inconsistent with soil conservation.
Quaker Valley claims that because the Hunterdon County Soil Conservation District approved Quaker Valley's plan -- known as a C.251 Plan -- to address the storm-water runoff from the construction of the hoop houses, it therefore had complied with paragraph seven of the deed of easement. ("No activity shall be permitted on the Premises which would be detrimental to ... erosion control, or soil conservation."). The SADC disputes that the approval of the C.251 storm-water runoff plan gave Quaker Valley the authorization to destroy prime soil on the twenty-acre field. It bears mentioning that Quaker Valley never approached the Hunterdon County Agriculture Development Board or the SADC, the entities responsible for enforcing the terms of the easement, to seek **49 advice about or approval for leveling the twenty-acre field of prime soil.
II.
A.
In February 2008, the trial court temporarily enjoined Quaker Valley from continuing construction of the hoop houses. Two months later, the court entered a preliminary injunction barring earthmoving operations in violation of the deed of easement and the ARDA and barring the use of any of the constructed hoop houses.[6]
*1003 The SADC moved for summary judgment on its claims that Quaker Valley had violated the deed of easement and ARDA; Quaker Valley cross-moved for summary judgment on its claims that the deed was unenforceable and that the SADC, through its enforcement efforts, had violated the New Jersey Civil Rights Act.
B.
On August 8, 2012, the Honorable Peter A. Buchsbaum, J.S.C., granted summary judgment in favor of the SADC, finding that Quaker Valley had violated the terms of the deed of easement and the ARDA. The court maintained that the construction of greenhouses and hoop houses, which is a permitted use under the deed, had to be reconciled with the provision banning activities detrimental to "soil conservation." Looking to the definitions of "farmland" in the Open Space Preservation Act, L. 1989, c. 183, and the Garden State Preservation Trust Act, N.J.S.A. 13:8C-3, for guidance, the court asserted that "the content of the soil, the soil's ability to support agriculture, and the ability of the land to have agriculture production as its first priority use are at the core of farmland preservation." The court also noted that "the content of **50 the soil" on the Quaker Valley property was "a critical factor" in its "gaining preserved farmland status." The court cast the issue as "whether the construction of the [hoop houses] would allow [Quaker Valley] to change the composition of the soil so drastically."
Ultimately, the court concluded that even if Quaker Valley had the right to " 'grade' the land, it did not have the authority to permanently change the unique soil structure through a major earth-moving project." The court determined that Quaker Valley's construction activities "destroyed the quality of the soil," rendering the field unfit "for normal agricultural use," and thus violated the deed of easement and the ARDA.
The court rejected Quaker Valley's argument that the C.251 Plan, which was intended to control drainage and prevent soil erosion from the construction project, authorized the kind of excavation and ground leveling that led to the destruction of the quality of the prime soil.
The court dismissed Quaker Valley's civil-rights claim. It found that the SADC was simply acting within the guidelines set forth in the ARDA and therefore rejected Quaker Valley's assertion that the governmental authorities improperly infringed on its property rights or engaged in conduct that shocked the court's conscience.
In June 2013, the court conducted a four-day trial on remediation. In setting forth the criteria for a remediation plan, the court recognized that, because of the "unalterabl[e]" changes made to the land, Quaker Valley would not be able to restore the soil completely "to its prior character and chemistry" or "replicate precisely the prior slopes" on the field. Nevertheless, the court ordered Quaker Valley to fill the most disturbed areas with specific depths of subsoil and topsoil and to recreate the preexisting slopes. The court set target goals for the growth of "representative crops," such as "corn, hay, alfalfa, and soy beans." The court also allowed for the maintenance of some hoop houses in the area, provided their presence would be consistent with the remediation plan. The court ordered the Hunterdon County Soil Conservation **51 District or, if necessary, a court-appointed master to supervise the remediation plan.
Quaker Valley appealed.
C.
The Appellate Division initially affirmed. The panel recognized the tension between the deed of easement's soil conservation mandate and its allowance of the construction of agricultural buildings. The panel *1004 also acknowledged that the lack of clear standards concerning "the methods and extent of permissible soil displacement" during "greenhouse farming activities" creates "uncertainty and ambiguity." The panel, however, concluded that the undisputed facts did not leave it in a "grey" interpretive area because "the provisions of the [deed of easement], reasonably read together, do not authorize such permanent and unnecessary disruption and degradation of highly rated soils." The panel "discern[ed] no basis to disturb the court's decision on remedy."
D.
The Appellate Division then granted Quaker Valley's motion for reconsideration and reversed its affirmance of summary judgment in favor of the SADC, but affirmed the dismissal of Quaker Valley's civil-rights claim. The panel also noted that any judgment on remedy must await a final determination on whether Quaker Valley is in violation of the deed of easement and ARDA.
In light of the competing terms of the deed of easement, the panel framed the issue concisely. "[A] farmer may not, in the process of building structures for agricultural purposes, disregard the project's effects on the soil," and "the duty to conserve soil must not be so great that it precludes a farmer's ability to engage in a permitted construction project." Within that framework, the panel adopted a standard for the interpretation of the deed of easement: "[T]he construction of structures for agricultural purposes (including hoophouses)" is permissible "so long as the **52 landowner conserves soil to the extent practicable in doing so." Under that standard, the panel held that the trial "court must determine whether a more protective measure would have been both economically and practically feasible for the farm in question."
Although the panel maintained that the trial court relied "too heavily on soil conservation," it nevertheless held that "[i]f defendants did engage in broad-scale indiscriminate mixing of topsoil and subsoil, then we have no doubt that defendants violated paragraph 7" of the deed of easement. The panel, however, determined that genuinely disputed issues of fact remained concerning "whether such mixing occurred" and whether "prime soils were irremediably 'destroyed.' " The panel, therefore, remanded to the trial court for further proceedings under its enunciated test.
We granted the petitions for certification filed by the SADC, Hunterdon County, and Franklin Township, 229 N.J. 583, 164 A.3d 388 (2017) ; 229 N.J. 605, 164 A.3d 402 (2017) ; 229 N.J. 606, 164 A.3d 402 (2017), and a cross-petition filed by Quaker Valley, 229 N.J. 605, 164 A.3d 402 (2017). We also granted the motion of the New Jersey Farm Bureau to participate as amicus curiae.
III.
A.
The SADC asserts that the Appellate Division's "practicability" standard "prioritizes the agricultural industry over farmland preservation" and, "if left uncorrected, will severely undermine the Farmland Preservation Program by potentially allowing large scale destruction of agricultural soil so long as doing so promotes agricultural industry." The SADC emphasizes that "[o]ne of the fundamental purposes of ARDA is to preserve farmland permanently for a variety of agricultural uses by future generations of farmers" and that, "[b]y destroying the agricultural potential of the property's prime soil," Quaker Valley defeated that purpose. The SADC maintains that the deed of easement, purchased *1005 **53 through taxpayers' monies, restricts the landowner from using the land solely for its most financially beneficial purpose at the expense of soil conservation. According to the SADC, under the practicability standard, "a landowner could destroy a preserved farm's prime soil so long as some sort of agricultural use occurred."
The SADC also contends that the Appellate Division failed to afford its interpretation of its own regulation -- a regulation incorporated into the deed of easement -- appropriate deference. The SADC concludes that its "longstanding interpretation of ARDA does not promote agricultural industry over soil conservation, as this approach would undercut the goal of permanent preservation of productive farmland."
Last, the SADC rejects Quaker Valley's arguments that the Hunterdon County Soil Conservation District's approval of the C.251 Plan constituted compliance with the deed's restrictions and that the government actors' enforcement efforts violated the New Jersey Civil Rights Act.
B.
Quaker Valley counters that the SADC's failure to provide standards or guidelines, such as, "Thus far you may build (or grade) and no further," is fatal to its effort to enforce the "soil conservation" restriction. Quaker Valley contends that the SADC is bound to the deed of easement, which does not bar soil disturbance or restrict the construction of greenhouses. It maintains that the productivity of a farm into the future depends on land devoted to agricultural production, which includes "land under structures" devoted to agricultural and horticultural uses. Quaker Valley asserts that the deed of easement does not favor one particular form of agricultural production over another and that its greenhouses promote a valid agricultural purpose no different than the growing of row crops. In its view, the removal of soil as a precondition to the building of hoop houses is not an activity inconsistent with the deed.
**54 Quaker Valley particularly emphasizes that whether the soil on the twenty-acre field was in fact "prime soil" and whether the soil removed was mixed and irremediably degraded are disputed facts and, for support, points to what it considers to be competing opinions offered by the experts. According to Quaker Valley, the SADC overestimated the amount of topsoil removed during the grading process in preparation for the hoop houses, and the trial court "found that the two topsoil stockpiles derived from the tract ... were both available for reuse."
Quaker Valley, moreover, argues that it adhered to the C.251 Plan and therefore demonstrated that it complied with the soil conservation requirements of the deed of easement. Last, Quaker Valley alleges that an enforcement action without guidelines or standards constituted an arbitrary and unconstitutional regulatory taking.
C.
Amicus New Jersey Farm Bureau submits that because "the SADC has not adopted soil disturbance limitations in any form," farmers, such as Quaker Valley, have not been provided with adequate notice of what agricultural activities will violate a deed of easement. The Farm Bureau stresses that "soil disruption requires objective limits or standards" and that the SADC cannot establish that the soil disturbance in this case was a prohibited activity under the deed. According to the Bureau, the SADC's case-by-case approach -- without clear pre-existing standards -- violates substantive due process.
*1006 IV.
A.
In reviewing the propriety of a grant of summary judgment, "we apply the same standard governing the trial court -- we view the evidence in the light most favorable to the non-moving party."
**55 Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584, 46 A.3d 1262 (2012). Here, Quaker Valley must receive "the benefit of all favorable evidence and inferences presented in the record" in assessing whether it violated the deed of easement and ARDA. See id. at 585, 46 A.3d 1262. Even though this appeal does not come to us from a final agency determination, "an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible" is still entitled to deference. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89, 852 A.2d 1083 (2004). We review issues of law de novo. We therefore accord no deference to the interpretative analysis of either the Appellate Division or trial court, except as we are persuaded by the reasoning of those courts. Zabilowicz v. Kelsey, 200 N.J. 507, 512, 984 A.2d 872 (2009) ; see also Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").
B.
Before addressing the primary issue before us -- whether Quaker Valley's grading and leveling of the twenty-acre field violated the deed of easement and ARDA -- we begin with a brief overview of the New Jersey Farmland Preservation Program and the statutes that implement that program.
The Farmland Preservation Program was initiated in 1981 pursuant to the Farmland Preservation Bond Act, which created a financing scheme for acquiring "development" easements for farmlands. L. 1981, c. 276. In selling a development easement, the landowner in essence surrenders the right to develop the land for any nonagricultural purposes. The easements are aimed at preserving farmland in perpetuity. See Governor's Statement upon Signing S. 3233 (Aug. 31, 1981) ("[T]he purchase of development easements restricts the use of farmland to agricultural purposes, but allows the land to continue to be privately owned, tax-paying open space. The landowner can sell the property, as long as the **56 buyer continues to use it for farmland."). The "principal purpose" of the Farmland Preservation Bond Act is "the long-term preservation of significant masses of reasonably contiguous agricultural land ... and the maintenance and support of increased agricultural production as the first priority use of that land." N.J.S.A. 4:1C-13(h).
In line with this mission of protecting New Jersey's diminishing land from intensive nonagricultural development, the Legislature passed a series of bond acts, including the Open Space Preservation Bond Act of 1989, L. 1989, c. 183, and the Farmland and Historic Preservation and Blue Acres Bond Act of 1995, L. 1995, c. 204. The purpose of the bond acts was to make monies available for preserving farmland and open spaces. Most notably, in 1998, New Jersey's citizens approved a constitutional amendment directing that a portion of sales tax revenue be dedicated to preserving "farmland for agricultural or horticultural use and production." N.J. Const. art. VIII, § 2, ¶ 7.
The Right to Farm Act, N.J.S.A. 4:1C-1 to -10, another part of the Farmland Preservation Program, established the SADC to promulgate rules and to administer and enforce the goals of farmland preservation.
*1007 N.J.S.A. 4:1C-4, -5, -10.4.[7] The SADC is the enforcement arm of the ARDA. N.J.S.A. 4:1C-5, -6.
To repeat, the ARDA "authorize[s] the establishment of State and county organizations to coordinate the development of farmland preservation programs ... where agriculture will be presumed the first priority use of the land." N.J.S.A. 4:1C-12(c). The ARDA permits, through state, county, and municipal funding formulas, the purchase of development easements on farm property, **57 restricting the use of the land solely for agricultural purposes. N.J.S.A. 4:1C-31 ; see generally N.J.S.A. 4:1C-11 to -48.
The SADC and county-level agricultural development boards, established under N.J.S.A. 4:1C-14, act in partnership to preserve farmland. See N.J.S.A. 4:1C-12(c), -15. The county-level agricultural development boards are largely responsible for reviewing and approving applications to the Farmland Preservation Program. N.J.A.C. 2:76-6.5(a) to (e).
The criteria for evaluating an application for a development easement include a number of factors, such as the size of the property, its soil quality, the number of tillable acres, the commitment of a municipality and county to the "long term viability of the agricultural industry," and the "imminence" that agricultural land will be converted to a nonagricultural use. N.J.A.C. 2:76-6.16. Under the soil criterion, priority is "given to soils which exhibit superior quality, require minimal maintenance and have a greater potential for long term viability for a variety of agricultural purposes." N.J.A.C. 2:76-6.16(c)(1). Applying those factors, the county agricultural development boards determine how to best expend the limited funds available for farm preservation.
C.
The provisions of the deed of easement that now govern the 120-acre Quaker Valley farm are drawn from a regulation promulgated by the SADC. See N.J.A.C. 2:76-6.15. Under that regulation, "deed restrictions ... shall be liberally construed to effectuate the purpose and intent of the Farmland Preservation Bond Act and the [ARDA]." N.J.A.C. 2:76-6.15(c) (citation omitted). The SADC also instructs that "the easement must be read, and interpreted, in its entirety, so that the interpretation of each individual provision is consistent with the overall intent of the document and interpretation of all other provisions." SADC, Interpreting the Provisions of the Deed of Easement, Report No. 1 , General Guidance 4 (rev. May 26, 2011), http://www.state.nj.us/agriculture/sadc/farmpreserve/postpres/reportgeneralguidance.pdf.
**58 We now turn to the relevant terms of the deed of easement in this case. Those terms provide:
[Paragraph Two]. The premises shall be retained for agricultural use and production in compliance with N.J.S.A. 4:1C-11 [to -48], L. 1983, c. 32 [the ARDA], and all other rules promulgated by the [SADC]. See N.J.A.C. 2:76-6:15(a)(2).
[Paragraph Five]. No sand, gravel, loam, rock, or other minerals shall be deposited on or removed from the Premises excepting only those materials required for the agricultural purpose for which the land is being used. See N.J.A.C. 2:76-6:15(a)(5).
*1008 [Paragraph Seven]. No activity shall be permitted on the Premises which would be detrimental to ... soil conservation, nor shall any other activity be permitted which would be detrimental to the continued agricultural use of the Premises. See N.J.A.C. 2:76-6:15(a)(7).
[Paragraph Twelve]. ... [The landowner] shall be permitted to construct, improve or reconstruct any roadway necessary to service crops, bogs, agricultural buildings or reservoirs as may be necessary. See N.J.A.C. 2:76-6:15(a)(12).
[Paragraph Fourteen]. [The landowner] may construct any new buildings for agricultural purposes. See N.J.A.C. 2:76-6:15(a)(14).
Clearly, earth-moving activities, which will result in the disturbance of soil, are envisioned under the deed of easement and the SADC regulation. The SADC regulation and the deed advance the dual goals of the ARDA: promotion of the agricultural industry and preservation of farmland. N.J.S.A. 4:1C-12. The regulation and easement terms encourage the agricultural use of preserved farmland, N.J.A.C. 2:76-6:15(a)(2), which includes the construction of roads and buildings for agricultural purposes, N.J.A.C. 2:76-6:15(a)(12), (14). They also unambiguously prohibit activities that are "detrimental" to soil preservation. N.J.A.C. 2:76-6:15(a)(7). The deed's terms must be read reasonably to achieve their aims, so that one is not sacrificed for another. That requires that the terms be reconciled in a manner that a reasonable person would have understood at the time the parties agreed to the deed of easement.
We understand that our task is made difficult by the failure of the SADC to promulgate regulations to guide farmers on the kind and extent of agricultural activities that are permissible under the deed. Farmers must know before they act -- not afterwards -- whether a construction project consistent with agricultural use and production is at odds with soil conservation. Any regulated **59 industry has a right to know the permissible limits of its activities through clearly delineated guidelines or through a process of seeking authorization from the regulator.
However, the absence of regulations or a permitting process does not mean that anything goes -- that one easement term can be read out of the deed to advance a preferred term. If this were a closer case, we might conclude that the lack of clearly enunciated guidelines bars an enforcement action. But the activities here were so extreme that, in the end, we are persuaded on this record that no landowner could have reasonably believed that the leveling of a twenty-acre field and destruction of so much prime soil was permissible under the deed of easement.
V.
A.
The undisputed evidence before us is that Quaker Valley's leveling activities in preparation for the hoop houses led to drastic and permanent alterations to the quality of the soil. While the use of preserved farmland for nursery production is plainly a permitted use under the deed, Quaker Valley is obliged to manage the property in a manner that does not violate other terms of the deed of easement, namely soil conservation. While Quaker Valley had a right to construct hoop houses, it did not have the right to needlessly destroy so much prime soil.
Based on the record before us, we agree with the trial court that Quaker Valley's activities "did damage to both soil conservation and future agricultural use" and thereby constituted a gross violation of the ARDA and the deed to which the farmland was subject. While Quaker Valley's construction *1009 of hoop houses to protect their horticultural crops was an appropriate agricultural use for the preserved farmland, it was required to be carried out in balance with soil conservation and the ARDA's overarching focus on preserving the agricultural use of farmland in perpetuity. All the experts agreed that Quaker Valley caused significant **60 damage to the quality of the soil. There is no genuine dispute about that material fact. According to Quaker Valley's own expert, the massive leveling activities "drastically altered" the quality of the prime soil such that, without remediation, it will no longer be possible to use the soil for row crops. In other words, Quaker Valley's activities did not fall within a grey zone -- but rather plainly violated the ARDA's goal of preserving the agricultural productivity of the farmland.
Although the leveling of farmland in preparation for hoop houses may be a common agricultural practice, such activities cannot trump other express provisions of the deed and ARDA. One of the fundamental purposes of the ARDA is to preserve farmland permanently for a variety of agricultural uses by future generations of farmers. See N.J.S.A. 4:1C-13(b) (providing non-exhaustive list of agricultural activities that are contemplated by ARDA). While the alterations to the soil may have made the land more suitable for nursery operations, Quaker Valley permanently destroyed the use of the soil for other agricultural uses, specifically the growing of row crops -- the very agricultural use which was a significant reason the property was originally selected to be preserved.
As for the deed of easement, the SADC has emphasized that its provisions must be read in their entirety. Accordingly, the provision authorizing the construction of new structures, N.J.A.C. 2:76-6:15(a), does not override all others and cannot be divorced from the deed's express prohibition against activities detrimental to soil conservation. Quaker Valley's leveling activities, which indisputably nullified a large swath of soil for the growing of row crops in the future, clearly violated the deed of easement.
Nor do we find merit in Quaker Valley's argument that their adherence to the C.251 Plan is evidence that their activities were not detrimental to soil conservation. The C.251 Plan -- in accordance with the Soil Erosion and Sediment Control Act, N.J.S.A. 4:24-39 to -55 -- was limited to concerns about soil erosion, sedimentation, and related storm water management controls. It **61 did not authorize Quaker Valley to permanently alter the soil profile or to intermix layers of the topsoil and subsoil. The purpose of a C.251 Plan is, in part, to protect the land from storm water runoff and conserve the soil from erosion. N.J.S.A. 4:24-40. The C.251 Plan did not authorize the despoiling of large quantities of prime soil.
Finally, while there was no dispute about whether Quaker Valley had permanently altered the soil profile, there was, in fact, disagreement among the experts concerning the degree of remediation necessary to address the violation of the easement. Those disagreements were aired at a four-day trial on the issue of remedy. After hearing from the SADC's and Quaker Valley's experts, Judge Buchsbaum made factfindings in which he accepted part of Quaker Valley's expert's conclusions, including the amount of topsoil that would need to be restored. As for the differing opinions about the condition of the topsoil that had been stockpiled, Judge Buchsbaum stated that the "degree of treatment" to be used on the existing soil stockpiles "will be addressed during the actual remediation process." During remediation, Quaker Valley will thus have the opportunity to demonstrate how much of the topsoil *1010 was properly removed and stockpiled during the leveling operations.
B.
Under the Appellate Division's standard, a court would consider "whether a more protective measure would have been both economically and practically feasible" when a farmer erects a structure for an agricultural purpose. (emphasis added). The flaw in that standard is that it subordinates soil conservation to agricultural use. That standard does not give due deference to the plain language of the ARDA and the SADC's own interpretation of the statute, as reflected in the regulation which governs deeds for development easements. The deed of easement and the SADC regulation plainly state that "[n]o activity shall be permitted on the Premises which would be detrimental to ... soil conservation."
**62 N.J.A.C. 2:76-6.15(a)(7). Accordingly, the economics of a particular agricultural use cannot be the end of the analysis. The government's purchase of the easement protects noneconomic interests as well, specifically the preservation of farmland and its soil. Taken to the extreme, that standard might allow landowners to permanently destroy large quantities of quality soil as long as it is more "economically and practically feasible" to do so. An economically lucrative hoop house can presumably be built or taken down in a matter of days, but once quality soil is permanently destroyed, it may take countless years to be restored.
C.
Although the record indicates that the SADC has considered parameters regarding soil disturbance on preserved properties, the agency has not, to date, exercised its statutory authority to promulgate any relevant standards regarding the nature and extent of soil disturbance that is allowable for the purposes of greenhouse construction and other construction projects.[8] As discussed above, the ARDA and the existing SADC regulation have a dual purpose: to strengthen the agricultural industry and to preserve farmland. Both are important goals; neither is subordinate to the other. To the extent that there may be tension or conflict between those dual goals, there is no indication in the history or language of the ARDA or the SADC regulation that one goal should inevitably supersede the other. Rather, the approach must be to balance farmland preservation and strengthen the agricultural industry.
The most relevant point of uncertainty for our discussion here involves the construction of new structures for agricultural purposes -- an activity that is expressly permitted by the SADC regulation, N.J.A.C. 2:76-6:15(a)(14). Structures are certainly a **63 crucial component of agricultural operations, such as livestock, dairy, equine, or greenhouse operations. Some degree of soil disturbance will be incidental to the construction of such structures. Thus, while the SADC regulation categorically prohibits activities that "would be detrimental" to soil conservation, N.J.A.C. 2:76-6:15(a)(7), the regulation also authorizes owners of preserved farms to undertake activities that, in effect, may alter the soil. The SADC has not provided any guidance on the degree or magnitude of soil displacement that is actually permissible -- that is, the scope of soil displacement that would rise to the level of being "detrimental to the continued agricultural use" of the preserved farmland. Ibid.
In sum, while owners of preserved farmlands are on notice of the requirement *1011 to conserve the soil, they are left without adequate direction on the tangible constraints on their agricultural use of the land. "Persons subject to regulation are entitled to something more than a general declaration of statutory purpose to guide their conduct ...." Boller Beverages, Inc. v. Davis, 38 N.J. 138, 152, 183 A.2d 64 (1962). Farmers are entitled to "sufficiently definite regulations and standards" so that administrative decision-making is fair and predictable. Ibid.
Nor is it the Judiciary's domain to create guidelines regarding the scope and nature of excavation and construction activities permitted on preserved farmland property. As the agency responsible for the administration and enforcement of the ARDA, and given its agricultural expertise, the SADC is in the best position to promulgate such guidelines. See Bergen Pines Cty. Hosp. v. Dep't of Human Servs., 96 N.J. 456, 474, 476 A.2d 784 (1984) (stating that agencies are delegated authority to promulgate rules and implement policy because they have "the staff, resources, and expertise to understand and solve those specialized problems"). If the SADC fails to undertake the necessary rulemaking to establish guidance on the extent of soil disturbance that is permissible on preserved farms, then it can expect administrative due process **64 challenges to its enforcement actions. It is only the extreme nature of this case that saves the present enforcement action.
D.
Finally, we find no merit in Quaker Valley's civil-rights claim. Under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2, the party alleging a claim must show a violation of a substantive right or that someone "acting under color of law" interfered with or attempted to interfere with a substantive right. N.J.S.A. 10:6-2(c). As the trial court found, the SADC's efforts fell fully within its statutory mandate. The SADC simply sought an enforcement action because it determined that Quaker Valley had violated the terms of the deed. Nothing in the record suggests that the enforcement action was a product of nefarious State action or that the agency engaged in illicit "threats, intimidation or coercion" against Quaker Valley. See N.J.S.A. 10:6-2(c). As such, we affirm the Appellate Division's dismissal of the civil-rights claim.
VI.
For the reasons expressed, we reverse the judgment of the Appellate Division, which overturned the trial court's grant of summary judgment in favor of the SADC. We affirm the dismissal of Quaker Valley's civil-rights claim.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN'S opinion.

The SADC provided Hunterdon County with a grant of $241,608.04 to purchase the Mathews' farm. The grant monies were made available through the Open Space Preservation Bond Act of 1989, L. 1989, c. 183.

Quaker Valley acquired the farm for approximately $4200 per acre. Presumably, had there been no limitation on the development rights of the farm, Quaker Valley would have paid a higher price to purchase the property. See State Agric. Dev. Comm., Farmland Availability/Farmland Affordability, https://nj.gov/agriculture/sadc/news/hottopics/farmavailabilityintro.pdf ("The Farmland Preservation Program helps make preserved farmland more affordable to farmers by removing the development value from the land.").

Since 1994, hoop houses have been present on the farmland.

The team included representatives from the SADC, the Hunterdon County Agriculture Development Board, the National Resources Conservation Service (an agency of the United States Department of Agriculture), the New Jersey Department of Agriculture, and the Rutgers School of Environmental and Biological Sciences.

The trial court subsequently determined that Quaker Valley had not carried out excavation activities in area one and that it was thus not in need of remediation. Because area one is comprised of approximately five acres, we accordingly refer to the area at issue as a twenty-acre field.

Quaker Valley had already constructed sixteen hoop houses (twelve with plastic covers and four without).

The SADC consists of eleven members, including the Secretary of Agriculture, the Commissioner of Environmental Protection, the Commissioner of Community Affairs, the State Treasurer, and the Dean of Cook College of Rutgers University (currently known as the Rutgers School of Environmental and Biological Sciences), or their designees, and other citizens, including farmers. N.J.S.A. 4:1C-4.

During oral argument, counsel for the SADC relayed that the agency had "undertaken internal review processes" but had "held off doing anything pending resolution of this case."